**Luther HAYNES and Dorothy Haynes, Plaintiffs–Appellants,**

v.

**ALFRED A. KNOPF, INCORPORATED, and Nicholas Lemann, Defendants–Appellees.**

**No. 93–1775.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1993.

Decided Nov. 4, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 17, 1993.

Michael Goldfein, Daniel S. Hefter (argued), Arthur F. Radke, Caroline K. Vickrey, Maureen A. Gorman, Hefter & Radke, Chicago, IL, for plaintiffs-appellants.

James A. Klenk (argued), Samuel Fifer, Gregory R. Naron, Sonnenschein, Nath & Rosenthal, Chicago, IL, for defendants-appellees.

Before POSNER, Chief Judge, MANION, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

POSNER, Chief Judge.

Luther Haynes and his wife, Dorothy Haynes née Johnson, appeal from the dismissal on the defendants' motion for summary judgment of their suit against Nicholas Lemann, the author of a highly praised, best-selling book of social and political history called *The Promised Land: The Great Black Migration and How It Changed America* (1991), and Alfred A. Knopf, Inc., the book's publisher. The plaintiffs claim that the book libels Luther Haynes and invades both plaintiffs' right of privacy. Federal jurisdiction is based on diversity, and the common law of Illinois is agreed to govern the substantive issues. The appeal presents difficult issues at the intersection of tort law and freedom of the press.

Between 1940 and 1970, five million blacks moved from impoverished rural areas in the South to the cities of the North in search of a better life. Some found it, and after sojourns of shorter or greater length in the poor black districts of the cities moved to middle-class areas. Others, despite the ballyhooed efforts of the federal government, particularly between 1964 and 1972, to erase poverty and racial discrimination, remained mired in what has come to be called the "urban ghetto." *The Promised Land* is a history of the migration. It is not history as a professional historian, a demographer, or a social scientist would write it. Lemann is none of these. He is a journalist and has written a journalistic history, in which the focus is on individuals whether powerful or representative. In the former group are the politicians who invented, executed, or exploited the "Great Society" programs. In the latter are a handful of the actual migrants. Foremost among these is Ruby Lee Daniels. Her story is the spine of the book. We are introduced to her on page 7; we take leave of her on page 346, within a few pages of the end of the text of the book.

When we meet her, it is the early 1940s and she is a young woman picking cotton on a plantation in Clarksdale, Mississippi. "[B]lack sharecropper society on the eve of the introduction [in the 1940s] of the mechanical cotton picker [a major spur to the migration] was the equivalent of big-city ghetto society today in many ways. It was the national center of illegitimate childbearing and of the female-headed family." Ruby had married young, but after her husband had been inducted into the army on the eve of World War II she had fallen in love with a married man, by whom she had had a child. The man's wife died and Ruby married him, but they broke up after a month. Glowing reports from an aunt who had moved to Chicago persuaded Ruby Daniels to move there in 1946. She found a job doing janitorial work, but eventually lost the job and went on public aid. She was unmarried, and had several children, when in 1953 she met "the most important man in her life." Luther Haynes, born in 1924 or 1925, a sharecropper from Mississippi, had moved to Chicago in an effort to effect a reconciliation with his wife. The effort had failed. When he met Ruby Daniels he had a well-paying job in an awning factory. They lived together, and had children. But then "Luther began to drink too much. When he drank he got mean, and he and Ruby would get into ferocious quarrels. He was still working, but he wasn't always bringing his paycheck home." Ruby got work as a maid. They moved to a poorer part of the city. The relationship went downhill. "It got to the point where [Luther] would go out on Friday evenings after picking up his paycheck, and Ruby would hope he wouldn't come home, because she knew he would be drunk. On the Friday evenings when he did come home—over the years Ruby developed a dev-

astating imitation of Luther, and could re-create the scene quite vividly—he would walk into the apartment, put on a record and turn up the volume, and saunter into their bed-room, a bottle in one hand and a cigarette in the other, in the mood for love. On one such night, Ruby's last child, Kevin, was con-ceived. Kevin always had something wrong with him—he was very moody, he was scraw-ny, and he had a severe speech impediment. Ruby was never able to find out exactly what the problem was, but she blamed it on Lu-ther; all that alcohol must have gotten into his sperm, she said."

Ruby was on public aid, but was cut off when social workers discovered she had a man in the house. She got a night job. Luther was supposed to stay with the chil-dren while she was at work, especially since they lived in a dangerous neighborhood; but often when she came home, at 3:00 a.m. or so, she would "find the older children awake, and when she would ask them if Luther had been there, the answer would be, 'No, ma'am.'" Ruby's last aid check, arriving providentially after she had been cut off, enabled the couple to buy a modest house on contract—it "was, by a wide margin, the best place she had ever lived." But "after only a few months, Luther ruined everything by going out and buying a brand-new 1961 Pon-tiac. It meant more to him than the house did, and when they couldn't make the house payment, he insisted on keeping the car" even though she hadn't enough money to buy shoes for the children. The family was kicked out of the house. They now moved frequently. They were reaching rock bot-tom. At this nadir, hope appeared in the ironic form of the Robert Taylor Homes, then a brand-new public housing project, now a notorious focus of drug addiction and gang violence. Ruby had had an application for public housing on file for many years, but the housing authority screened out unwed moth-ers. Told by a social worker that she could have an apartment in the Taylor Homes if she produced a marriage license, she and Luther (who was now divorced from his first wife) were married forthwith and promptly accepted as tenants. "The Haynes family chose to rejoice in their good fortune in becoming residents of the Robert Taylor Homes. As Ruby's son Larry, who was twelve years old at the time, says, 'I thought that was the beautifullest place in the world.'"

Even in the halcyon days of 1962, the Robert Taylor Homes were no paradise. There was considerable crime, and there were gangs, and Ruby's son Kermit joined one. Kermit was not Luther's son and did not recognize his authority. The two quar-reled a lot. Meanwhile Luther had lost his job in the awning factory "that he had had for a decade, and then bounced around a little. He lost jobs because of transportation problems, because of layoffs, because of a bout of serious illness, because of his drink-ing, because he had a minor criminal record (having been in jail for disorderly conduct following a fight with Ruby), and because creditors were after him." He resumed "his old habit of not returning from work on Fridays after he got his paycheck." One weekend he didn't come home at all. In a search of his things Ruby discovered evi-dence that Luther was having an affair with Dorothy Johnson, a former neighbor. "Lu-ther was not being particularly careful; he saw in Dorothy, who was younger than Ruby, who had three children compared to Ruby's eight, who had a job while Ruby was on public aid, the promise of an escape from the ghetto, and he was entranced." The children discovered the affair. Kermit tried to stran-gle Luther. In 1965 Luther moved out per-manently, and eventually he and Ruby di-vorced.

Ruby remained in the Robert Taylor Homes until 1979, when she moved back to Clarksdale. She had become eligible for so-cial security in 1978; and with her surviving children (one of her sons had died, either a suicide or murdered) now adults, though most of them deeply troubled adults and Kevin, whom Ruby in a custody proceeding described as retarded, still living at home, Ruby "is settling into old age with a sense of contentment about the circumstances she has found." But "there has always been that nagging sensation of incompleteness, which made itself felt most directly in her relation-ships with men."

After divorcing Ruby, Luther Haynes married Dorothy Johnson. He is still married to her, "owns a home on the far South Side of Chicago, and has worked for years as a parking-lot attendant; only recently have he and Ruby found that they can speak civilly to each other on the phone."

There is much more to the book than our paraphrase and excerpts—much about other migrants, about the travails of Ruby's children, about discrimination against blacks in both the North and the South, and about the politics of poverty programs in Washington and Chicago. But the excerpts we have quoted contain all the passages upon which the Hayneses' lawsuit is founded.

■ The charge of libel is confined to three statements in the book: that Haynes left his children alone at night when he was supposed to be watching them; that he lost a job or jobs because of drinking; and that he spent money on a car that he should have used to buy shoes for his children. We do not agree with the defendants that the dismissal of the libel claim must be upheld because Haynes has failed to allege pecuniary loss from the alleged libels ("special damages"). The rule in Illinois, which used to be limited to slander cases but has been extended to all defamation cases, *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 267 (7th Cir.1983), is that a plaintiff can maintain a suit for defamation without proof of special damages only if the defamatory statement falls into one of four "per se" categories: commission of a crime; infection with a type of communicable disease that could cause the infected person to be shunned; malfeasance or misfeasance in the performance of an office or a job; and (what is closely related, but less redolent of actual misconduct and usable by business firms as well as by workers or professionals) unfitness for one's profession or trade. *Id.* at 267–68; *Mittelman v. Witous*, 135 Ill.2d 220, 142 Ill. Dec. 232, 241, 552 N.E.2d 973, 982 (1989). The statements that Haynes claims are libelous can be interpreted, though just barely, as implying that he was guilty of criminal neglect of his children and was unable to discharge the duties of at least one of his jobs because of alcohol. Ever since modification

of the "innocent construction" doctrine in *Chapski v. Copley Press*, 92 Ill.2d 344, 65 Ill.Dec. 884, 442 N.E.2d 195 (1982), which left the doctrine meaning merely that a court should not strain to put a defamatory interpretation on an ambiguous statement, see *id.* 65 Ill.Dec. at 888, 442 N.E.2d at 199, Illinois courts (and federal courts when interpreting Illinois law) have been quick to find implications of criminal conduct or of employee or business misconduct in statements that might have seemed susceptible of an interpretation that would have taken them out of the per se categories. See *Babb v. Minder*, 806 F.2d 749, 758 (7th Cir.1986) (statement that employee had "mooned" held actionable as an accusation of the crime of indecent exposure); *Costello v. Capital Cities Communications, Inc.*, 125 Ill.2d 402, 126 Ill.Dec. 919, 925, 532 N.E.2d 790, 796 (1988) (statement that employee had lied held actionable as implying lack of integrity in performance of duties); *Fleming v. Kane County*, 636 F.Supp. 742, 746–47 (N.D.Ill.1986) (same); *Crinkley v. Dow Jones & Co.*, 119 Ill.App.3d 147, 74 Ill.Dec. 636, 639, 456 N.E.2d 138, 141 (1983) (statement alleging payoffs to agents of foreign governments held actionable); *Brown & Williamson Tobacco Corp. v. Jacobson, supra*, 713 F.2d at 268–69 (allegations that cigarette company attempted through its advertising to entice children to smoke held actionable).

■ The requirement of proving special damages does prevent Haynes from basing a libel claim on two other statements in the book that he contends are false: that his drinking was responsible for Kevin's defects and that his motives for leaving Ruby for Dorothy were financial. (The second is an implication rather than an outright statement, but we shall give Haynes the benefit of the doubt and assume with him that the book implies that his motives were financial rather than—an interpretation that the passage also supports, and that the innocent-construction rule, even in its tempered form after *Chapski*, might therefore require be placed on it— a more diffuse hope of betterment.) These statements are not within any of the per se categories and therefore are not actionable, because Haynes alleges no pecuniary injury.

They probably would be nonactionable in any event as obvious statements of opinion (Ruby's and Lemann's respectively) rather than of fact. A statement of fact is not shielded from an action for defamation by being prefaced with the words "in my opinion," but if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 17–21, 110 S.Ct. 2695, 2704–07, 111 L.Ed.2d 1 (1990); *Mittelman v. Witous, supra,* 142 Ill.Dec. at 241–43, 552 N.E.2d at 982–84; *Beasley v. St. Mary's Hospital,* 200 Ill.App.3d 1024, 146 Ill.Dec. 714, 720, 558 N.E.2d 677, 683 (1990); *Gross v. New York Times Co.,* 82 N.Y.2d 146, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993). The facts about Kevin's condition and about the respective financial circumstances of Ruby and Dorothy were uncontested, and Ruby and Lemann were entitled to their interpretation of them. Luther drank heavily; the proposition that a man's heavy drinking can, and that Luther's heavy drinking did, damage a fetus is represented in the book merely as Ruby's conjecture. A reasonable reader would not suppose that she had proof, or even the scientific knowledge that might ground a reasonable inference. As for Luther's motives for leaving Ruby for Dorothy, they can never be known for sure (even by Luther) and anyone is entitled to speculate on a person's motives from the known facts of his behavior. Luther Haynes left a poor woman for a less poor one, and Lemann drew a natural though not inevitable inference. He did not pretend to have the inside dope. He and Ruby claim insight, not information that the plaintiff might be able to prove false in a trial.

Lemann's source for the only statements upon which Luther Haynes can base his claim for defamation, as for most of the rest of what he wrote about Haynes, was Ruby Daniels. He had interviewed Haynes as well, but Haynes in his deposition denied that Lemann had questioned him about his relationship with Ruby. Haynes swears that he never left his children alone in a dangerous neighborhood when he was supposed to be with them, did not by his expenditures on the Pontiac deprive his children of shoes, and was fired not for drinking but because he had been given a bottle of liquor by a friend which was found unopened in his pocket by his supervisor; since his job was that of an armed security guard, the supervisor was unwilling to take a chance on the truthfulness of his story. Haynes's version of how he lost a job because of "drinking" is corroborated by Lemann's notes of his interview with Haynes, but is not mentioned in the book.

■ It would take a trial to decide whether Ruby Daniels (and hence Nicholas Lemann) or Luther Haynes should be believed on these three matters. But the district judge was nevertheless correct to dismiss the defamation claim because if the gist of a defamatory statement is true, if in other words the statement is substantially true, error in detail is not actionable. *Berkos v. National Broadcasting Co.,* 161 Ill.App.3d 476, 113 Ill.Dec. 683, 693–94, 515 N.E.2d 668, 678–79 (1987); *American International Hospital v. Chicago Tribune Co.,* 136 Ill.App.3d 1019, 91 Ill.Dec. 479, 782, 483 N.E.2d 965, 968 (1985); *Tunney v. American Broadcasting Co.,* 109 Ill.App.3d 769, 65 Ill.Dec. 294, 297–98, 441 N.E.2d 86, 89–90 (1982); *Vachet v. Central Newspapers, Inc.,* 816 F.2d 313 (7th Cir. 1987); *Herron v. King Broadcasting Co.,* 112 Wash.2d 762, 776 P.2d 98, 102–05 (1989); *Hovey v. Iowa State Daily Publication Board, Inc.,* 372 N.W.2d 253, 256 (Ia.1985); *Tschirgi v. Lander Wyoming State Journal,* 706 P.2d 1116, 1120 (Wyo.1985); *Korkala v. W.W. Norton & Co.,* 618 F.Supp. 152, 155 (S.D.N.Y.1985).

■ To evaluate the application of this rule to Haynes's libel claims requires us to consider facts brought out in discovery and not contested, although they are not in the book. Haynes in his deposition admitted to drinking heavily during the period when he lost his job because of the unopened liquor bottle in his pocket. He admitted to being arrested and jailed for assaulting a police officer after drinking. When he walked out on Ruby he also walked out on his four children by her, and he refused to support

them. She was forced to obtain court orders for child support. Haynes repeatedly flouted the orders and eventually was jailed for contempt. During their divorce proceedings it came out that, after leaving Ruby, he and Dorothy Johnson had had a marriage ceremony and he had entered their names in the marriage registry of the county clerk's office—two years before his divorce from Ruby.

Beside these uncontested facts—not to mention the facts about Haynes in the book that he does not contend are false—the alleged falsehoods pale. They do not exhibit him in a worse light than a bare recitation of the uncontested facts about his behavior in relation to Ruby and her children would do. For Lemann left out much that was true. He did not mention the bigamous marriage, the repeated flouting of child-support orders, the arrest for assaulting a police officer, or the jailing for contempt. Substitute the true for the false (if Haynes is believed), and the damage to Haynes's reputation would be no less.

The rule of substantial truth is based on a recognition that falsehoods which do no *incremental* damage to the plaintiff's reputation do not injure the only interest that the law of defamation protects. A news report that contains a false statement is actionable "only when 'significantly greater opprobrium' results from the report containing the falsehood than would result from the report without the falsehood." *Herron v. King Broadcasting Co., supra,* 776 P.2d at 102. Even when the plaintiff in a defamation suit is not a public figure, the Supreme Court insists in the name of the First Amendment that unless the author is deliberately lying or is recklessly indifferent to the truth or falsity of what he says (neither is a plausible hypothesis here), the plaintiff must prove actual though not necessarily pecuniary harm in order to recover damages. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349–50, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789 (1974). Falsehoods that do not harm the plaintiff's reputation more than a full recital of the true facts about him would do are thus not actionable. The rule making substantial truth a complete

defense and the constitutional limitations on defamation suits coincide.

Ordinarily the question whether a defamatory work is substantially true although erroneous in some details is for the jury. *Kohn v. West Hawaii Today, Inc.,* 65 Haw. 584, 656 P.2d 79, 84 (1982). But no reasonable jury, even if it believed Luther Haynes over Ruby Daniels on every issue on which they differ, could find that *The Promised Land* was not substantially true in its depiction of Luther at the time he lived with Ruby. He *was* a heavy drinker, a bad husband, a bad father, an erratic employee. These are things either that he concedes or that are incontestably established by the judicial records in his matrimonial litigation. Whether he left the children alone at night on some occasions when Ruby was working, or was fired for drinking rather than for having liquor on his person while working, or preferred to spend money on his car than on his children's shoes, are details that, while not trivial, would not if corrected have altered the picture that the true facts paint. And it makes no difference that the true facts were unknown until the trial. A person does not have a legally protected right to a reputation based on the concealment of the truth. This is implicit in the rule that truth—not just known truth (see *Restatement (Second) of Torts* § 581A, comment h (1977); *Prosser and Keeton on the Law of Torts* § 116, at pp. 840–41 (5th ed. 1984))—is a complete defense to defamation. And the burden of proving falsity rests on the plaintiff. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 1563–64, 89 L.Ed.2d 783 (1986).

We must be careful, however, that we are not construing the gist of the allegedly defamatory statements so broadly as to invite defendants to commit, in effect, a further but privileged libel, by bringing to light every discreditable act that the plaintiff may have committed, in an effort to show that he is as "bad" as the defamatory statements depict him. This would strip people who had done bad things of any legal protection against being defamed; they would be defamation outlaws. The true damaging facts must be closely related to the false ones. But that

test is satisfied. Luther abandoned his children and was eventually jailed for doing so. These truths encompass and transcend what, whether or not it might be elevated to criminal neglect, is, after all, common enough—leaving children, some of them teenagers, unattended late at night. (And how different is that from leaving a child at night with a teenage babysitter?) An armed security guard who is discovered by his employer to have a bottle of liquor in his pocket is equivalent in irresponsible employee conduct to an ordinary worker found drinking on the job. And a decision to spend money on a car rather than on one's children's clothes is subsumed by total financial abandonment of one's children in violation of court orders, an abandonment compounded by a bigamous marriage to a woman who herself had children. The allegedly false facts about Luther were variants of the true that did not paint him in a worse light. Corresponding to the "immaterial error[s]" of which the substantial-truth cases speak, *Sivulich v. Howard Publications, Inc.*, 126 Ill.App.3d 129, 81 Ill. Dec. 416, 418, 466 N.E.2d 1218, 1220 (1984), the alleged falsehoods were merely illustrations of undoubted truths about Luther Haynes's character at the time, illustrations that even if false in detail conveyed an accurate impression. They were therefore substantially true within the meaning which this term must bear to make sense of the cases.

The major claim in the complaint, and the focus of the appeal, is not defamation, however; it is invasion of the right of privacy. In tort law the term "right of privacy" covers several distinct wrongs. Using a celebrity's (or other person's) name or picture in advertising without his consent. *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831 (6th Cir.1983); *Martin Luther King, Jr., Center for Social Change, Inc. v. American Heritage Products, Inc.*, 250 Ga. 135, 296 S.E.2d 697 (1982); *Haelan Laboratories v. Topps Chewing Gum*, 202 F.2d 866 (2d Cir.1953); *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1138–39 (7th Cir. 1985). Tapping someone's phone, or otherwise invading a person's private space. *De May v. Roberts*, 46 Mich. 160, 9 N.W. 146, 149 (1881); *Rhodes v. Graham*, 238 Ky. 225, 37 S.W.2d 46 (1931); *Roach v. Harper*, 143

W.Va. 869, 105 S.E.2d 564 (1958); *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 307 N.Y.S.2d 647, 544–55, 255 N.E.2d 765, 770–71 (1970); *Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir.1971). Harassing a celebrity by following her too closely, albeit on a public street. Cf. *Galella v. Onassis*, 487 F.2d 986, 995 and n. 12 (2d Cir.1973). Casting a person in a false light by publicizing details of the person's life that while true are so selected or highlighted as to convey a misleading impression of the person's character. *Time, Inc. v. Hill*, 385 U.S. 374, 391–94, 87 S.Ct. 534, 543–45, 17 L.Ed.2d 456 (1967). Publicizing personal facts that while true and not misleading are so intimate that their disclosure to the public is deeply embarrassing to the person thus exposed and is perceived as gratuitous by the community. *Daily Times Democrat v. Graham*, 276 Ala. 380, 162 So.2d 474 (1964); *Barber v. Time, Inc.*, 348 Mo. 1199, 159 S.W.2d 291 (1942); *Diaz v. Oakland Tribune, Inc.*, 139 Cal.App.3d 118, 188 Cal.Rptr. 762, 767–78 (1983); *Banks v. King Features Syndicate, Inc.*, 30 F.Supp. 352 (S.D.N.Y.1939). The last, the publicizing of personal facts, is the aspect of invasion of privacy charged by the Hayneses.

Even people who have nothing rationally to be ashamed of can be mortified by the publication of intimate details of their life. Most people in no wise deformed or disfigured would nevertheless be deeply upset if nude photographs of themselves were published in a newspaper or a book. They feel the same way about photographs of their sexual activities, however "normal," or about a narrative of those activities, or about having their medical records publicized. Although it is well known that every human being defecates, no adult human being in our society wants a newspaper to show a picture of him defecating. The desire for privacy illustrated by these examples is a mysterious but deep fact about human personality. It deserves and in our society receives legal protection. The nature of the injury shows, by the way, that the defendants are wrong to argue that this branch of the right of privacy requires proof of special damages. *Manville v. Borg–Warner Corp.*, 418 F.2d 434, 436–37

(10th Cir.1969); *Vassiliades v. Garfinckel's*, 492 A.2d 580, 594 (D.C.App.1985).

But this is not the character of the depictions of the Hayneses in *The Promised Land.* Although the plaintiffs claim that the book depicts their "sex life" and "ridicules" Luther Haynes's lovemaking (the reference is to the passage we quoted in which the author refers to Ruby's "devastating imitation" of Luther's manner when he would come home Friday nights in an amorous mood), these characterizations are misleading. No sexual act is described in the book. No intimate details are revealed. Entering one's bedroom with a bottle in one hand and a cigarette in the other is not foreplay. Ruby's speculation that Kevin's problems may have been due to Luther's having been a heavy drinker is not the narration of a sexual act.

We said that proof of special damages is not required in a case in which the public revelation of personal facts is claimed to be an invasion of privacy. Even so, a plaintiff is not allowed to evade the rule that requires proof of such damages in defamation cases (outside the per se categories) by attempting to prove that some of the personal facts publicized about him are false, unless he is prepared to prove special damages— and perhaps, as we are about to see, there is no "unless." Haynes denies that his drinking had anything to do with his son Kevin's defects or that he was actuated by mercenary considerations in leaving Ruby for Dorothy. These denials, we have seen, could not be made the basis of a libel case in the absence of proof of special damages, here lacking. No more, we think, can they be used to enhance a privacy case, whether it is a false-light case, *Brown & Williamson Tobacco Corp. v. Jacobson, supra,* 713 F.2d at 267; *Harte v. Chicago Council of Lawyers,* 220 Ill.App.3d 255, 163 Ill.Dec. 324, 327, 329, 581 N.E.2d 275, 278, 280 (1991); *Schaffer v. Zekman,* 196 Ill.App.3d 727, 143 Ill.Dec. 916, 921–22, 554 N.E.2d 988, 993–94 (1990); see generally *Restatement (Second) of Torts, supra,* § 652E, comment e, or, as here, a case about the publication of private facts. *Leidholdt v. L.F.P. Inc.,* 860 F.2d 890, 895 (9th Cir.1988). Indeed, that type of case-presup-poses the truth of the facts disclosed. *Id.* If they are false, the interest invaded is that protected by the defamation and false-light torts: the interest in being represented truthfully to the world.

Absence of special damages may be the reason why the Hayneses have not appealed the dismissal of their claim that the defendants cast Luther in a false light—though in fairness to him we should point out that they may have placed him in a false light with respect to his motives for leaving Ruby. Lemann's interview notes suggest (as the book does not, at least not clearly) that the major difference which Haynes perceived between the two women was one of character rather than of financial wherewithal. According to the notes, Haynes told Lemann that Ruby "never wanted to work. She wanted to sit around and be on aid. I called Ruby and asked her why she let 'Nita [their daughter] have a baby and she said, She's grown. I couldn't handle that talk, so I said forget it. Ruby was on aid when I met her, and she wanted to have more kids so she could have more aid. Dorothy had three kids, and a job."

This is an aside. The branch of privacy law that the Hayneses invoke in their appeal is not concerned with, and is not a proper surrogate for legal doctrines that are concerned with, the accuracy of the private facts revealed. It is concerned with the propriety of stripping away the veil of privacy with which we cover the embarrassing, the shameful, the tabooed, truths about us. *Leidholdt v. L.F.P. Inc., supra,* 860 F.2d at 895. The revelations in the book are not about the intimate details of the Hayneses' life. They are about misconduct, in particular Luther's. (There is very little about Dorothy in the book, apart from the fact that she had had an affair with Luther while he was still married to Ruby and that they eventually became and have remained lawfully married.) The revelations are about his heavy drinking, his unstable employment, his adultery, his irresponsible and neglectful behavior toward his wife and children. So we must consider cases in which the right of privacy has been invoked as a shield against the revelation of previous misconduct.

Two early cases illustrate the range of judicial thinking. In *Melvin. v. Reid*, 112 Cal.App. 285, 297 Pac. 91 (1931), the plaintiff was a former prostitute, who had been prosecuted but acquitted of murder. She later had married and (she alleged) for seven years had lived a blameless respectable life in a community in which her lurid past was unknown—when all was revealed in a movie about the murder case which used her maiden name. The court held that these allegations stated a claim for invasion of privacy. The Hayneses' claim is similar although less dramatic. They have been a respectable married couple for two decades. Luther's alcohol problem is behind him. He has steady employment as a doorman. His wife is a nurse, and in 1990 he told Lemann that the couple's combined income was $60,000 a year. He is not in trouble with the domestic relations court. He is a deacon of his church. He has come a long way from sharecropping in Mississippi and public housing in Chicago and he and his wife want to bury their past just as Mrs. Melvin wanted to do and in *Melvin v. Reid* was held entitled to do. Cf. *Briscoe v. Reader's Digest Ass'n*, 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34, 43 (1971). In Luther Haynes's own words, from his deposition, "I know I haven't been no angel, but since almost 30 years ago I have turned my life completely around. I stopped the drinking and all this bad habits and stuff like that, which I deny, some of [it] I didn't deny, because I have changed my life. It take me almost 30 years to change it and I am deeply in my church. I look good in the eyes of my church members and my community. Now, what is going to happen now when this public reads this garbage which I didn't tell Mr. Lemann to write? Then all this is going to go down the drain. And I worked like a son of a gun to build myself up in a good reputation and he has torn it down."

But with *Melvin v. Reid* compare *Sidis v. F–R Publishing Corp.*, 113 F.2d 806 (2d Cir. 1940), another old case but one more consonant with modern thinking about the proper balance between the right of privacy and the freedom of the press. A child prodigy had flamed out; he was now an eccentric recluse. The *New Yorker* ran a "where is he now" article about him. The article, entitled "April Fool," did not reveal any misconduct by Sidis but it depicted him in mocking tones as a comical failure, in much the same way that the report of Ruby's "devastating imitation" of the amorous Luther Haynes could be thought to have depicted him as a comical failure, albeit with sinister consequences absent from Sidis's case. The invasion of Sidis's privacy was palpable. But the publisher won. No intimate physical details of Sidis's life had been revealed; and on the other side was the undoubted newsworthiness of a child' prodigy, as of a woman prosecuted for murder. Sidis, unlike Mrs. Melvin, was not permitted to bury his past.

Evolution along the divergent lines marked out by *Melvin* and *Sidis* continued, compare *Barbieri v. News–Journal Co.*, 56 Del. 67, 189 A.2d 773 (1963), with *Virgil v. Time, Inc.*, 527 F.2d 1122 (9th Cir.1975)—until *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), which may have consigned the entire *Melvin* line to the outer darkness. *Rawlins v. Hutchinson Publishing Co.*, 218 Kan. 295, 543 P.2d 988, 993–96 (1975); *Romaine v. Kallinger*, 109 N.J. 282, 537 A.2d 284, 294–95 (1988); cf. *Forsher v. Bugliosi*, 26 Cal.3d 792, 163 Cal. Rptr. 628, 639, 608 P.2d 716, 726–27 (1980); *Street v. National Broadcasting Co.*, 645 F.2d 1227, 1235–36 (6th Cir.1981). A Georgia statute forbade the publication of names of rape victims. A television station obtained the name of a woman who had been raped and murdered from the indictment of her assailants (a public document), and broadcast it in defiance of the statute. The woman's father brought a tort suit against the broadcaster, claiming that the broadcast had violated his right of privacy. The broadcaster argued that the name of the woman was a matter of public concern, but the Georgia supreme court held that the statute established the contrary, and affirmed a finding of liability. The U.S. Supreme Court reversed, holding that the statute violated the First Amendment. The Court declined to rule whether the publication of truthful information can ever be made the basis of a tort suit for invasion of privacy, but held that the First Amendment creates a privilege to publish matters contained in public records even

if publication would offend the sensibilities of a reasonable person. Years later the Court extended the rule laid down in *Cox* to a case in which a newspaper published a rape victim's name (again in violation of a state statute) that it had obtained from a police report that was not a public document. *Florida Star v. B.J.F.*, 491 U.S. 524, 532, 109 S.Ct. 2603, 2608, 105 L.Ed.2d 443 (1989). Again the Court was careful not to hold that states can never provide a tort remedy to a person about whom truthful, but intensely private, information of some interest to the public is published. *Id.* at 541, 109 S.Ct. at 2613.

We do not think the Court was being coy in *Cox* or *Florida Star* in declining to declare the tort of publicizing intensely personal facts totally defunct. (Indeed, the author of *Cox* dissented in *Florida Star*.) The publication of facts in a public record or other official document, such as the police report in the *Florida Star*, is not to be equated to publishing a photo of a couple making love or of a person undergoing some intimate medical procedure; we even doubt that it would make a difference in such a case if the photograph had been printed in a government document (say the patient's file in a Veterans Administration hospital).

Yet despite the limited scope of the holdings of *Cox* and *Florida Star*, the implications of those decisions for the branch of the right of privacy that limits the publication of private facts are profound, even for a case such as this in which, unlike *Melvin v. Reid*, the primary source of the allegedly humiliating personal facts is not a public record. (The primary source is Ruby Daniels.) The Court must believe that the First Amendment greatly circumscribes the right even of a private figure to obtain damages for the publication of newsworthy facts about him, even when they are facts of a kind that people want very much to conceal. To be identified in the newspaper as a rape victim is intensely embarrassing. And it is not invited embarrassment. No one asks to be raped; the plaintiff in *Melvin v. Reid* did not ask to be prosecuted for murder (remember, she was acquitted, though whether she actually was innocent is unknown); Sidis did not decide to be a prodigy; and Luther Haynes

did not aspire to be a representative figure in the great black migration from the South to the North. People who do not desire the limelight and do not deliberately choose a way of life or course of conduct calculated to thrust them into it nevertheless have no legal right to extinguish it if the experiences that have befallen them are newsworthy, even if they would prefer that those experiences be kept private. The possibility of an involuntary loss of privacy is recognized in the modern formulations of this branch of the privacy tort, which require not only that the private facts publicized be such as would make a reasonable person deeply offended by such publicity but also that they be facts in which the public has no legitimate interest. *Leopold v. Levin*, 45 Ill.2d 434, 259 N.E.2d 250 (1970); *Beresky v. Teschner*, 64 Ill.App.3d 848, 21 Ill.Dec. 532, 536–37, 381 N.E.2d 979, 983–84 (1978); *Anonsen v. Donahue*, 857 S.W.2d 700, 704 (Tex.App.1993); *Diaz v. Oakland Tribune, Inc., supra*, 188 Cal.Rptr. at 768–70; *Gilbert v. Medical Economics Co.*, 665 F.2d 305, 307–08 (10th Cir.1981); *Campbell v. Seabury Press*, 614 F.2d 395 (5th Cir.1980) (per curiam); *Restatement (Second) of Torts, supra*, § 652D(b).

The two criteria, offensiveness and newsworthiness, are related. An individual, and more pertinently perhaps the community, is most offended by the publication of intimate personal facts when the community has no interest in them beyond the voyeuristic thrill of penetrating the wall of privacy that surrounds a stranger. The reader of a book about the black migration to the North would have no legitimate interest in the details of Luther Haynes's sex life; but no such details are disclosed. Such a reader does have a legitimate interest in the aspects of Luther's conduct that the book reveals. For one of Lemann's major themes is the transposition virtually intact of a sharecropper morality characterized by a family structure "matriarchal and elastic" and by an "extremely unstable" marriage bond to the slums of the northern cities, and the interaction, largely random and sometimes perverse, of that morality with governmental programs to alleviate poverty. Public aid policies discouraged Ruby and Luther from living together; public housing policies precipitated a marriage

doomed to fail. No detail in the book claimed to invade the Hayneses' privacy is not germane to the story that the author wanted to tell, a story not only of legitimate but of transcendent public interest.

The Hayneses question whether the linkage between the author's theme and their private life really is organic. They point out that many social histories do not mention individuals at all, let alone by name. That is true. Much of social science, including social history, proceeds by abstraction, aggregation, and quantification rather than by case studies; the economist Robert Fogel has won a Nobel prize for his statistical studies of economic history, including, not wholly unrelated to the subject of Lemann's book, the history of Negro slavery in the United States. But it would be absurd to suggest that cliometric or other aggregative, impersonal methods of doing social history are the only proper way to go about it and presumptuous to claim even that they are the best way. Lemann's book has been praised to the skies by distinguished scholars, among them black scholars covering a large portion of the ideological spectrum—Henry Louis Gates Jr., William Julius Wilson, and Patricia Williams. Lemann's methodology places the individual case history at center stage. If he cannot tell the story of Ruby Daniels without waivers from every person who she thinks did her wrong, he cannot write this book.

Well, argue the Hayneses, at least Lemann could have changed their names. But the use of pseudonyms would not have gotten Lemann and Knopf off the legal hook. The details of the Hayneses' lives recounted in the book would identify them unmistakably to anyone who has known the Hayneses well for a long time (members of their families, for example), or who knew them before they got married; and no more is required for liability either in defamation law, *Rosenblatt v. Baer*, 383 U.S. 75, 79–87, 86 S.Ct. 669, 672–77, 15 L.Ed.2d 597 (1966); *Stevens v. Tillman*, 855 F.2d 394, 397 (7th Cir.1988); *Brown & Williamson Tobacco Corp. v. Jacobson, supra*, 713 F.2d at 267, or in privacy law. *Daily Times Democrat v. Graham, supra*, 162 So.2d at 476; *Vassiliades v. Garfinckel's, supra*, 492 A.2d at 588. Lemann

would have had to change some, perhaps many, of the details. But then he would no longer have been writing history. He would have been writing fiction. The nonquantitative study of living persons would be abolished as a category of scholarship, to be replaced by the sociological novel. That is a genre with a distinguished history punctuated by famous names, such as Dickens, Zola, Stowe, Dreiser, Sinclair, Steinbeck, and Wolfe, but we do not think that the law of privacy makes it (or that the First Amendment would permit the law of privacy to make it) the exclusive format for a social history of living persons that tells their story rather than treating them as data points in a statistical study. Reporting the true facts about real people is necessary to "obviate any impression that the problems raised in the [book] are remote or hypothetical." *Gilbert v. Medical Economics Co., supra*, 665 F.2d at 308. And surely a composite portrait of ghetto residents would be attacked as racial stereotyping.

*The Promised Land* does not afford the reader a titillating glimpse of tabooed activities. The tone is decorous and restrained. Painful though it is for the Hayneses to see a past they would rather forget brought into the public view, the public needs the information conveyed by the book, including the information about Luther and Dorothy Haynes, in order to evaluate the profound social and political questions that the book raises. Given the *Cox* decision, moreover, all the discreditable facts about the Hayneses that are contained in judicial records are beyond the power of tort law to conceal; and the disclosure of those facts alone would strip away the Hayneses' privacy as effectively as *The Promised Land* has done. (This *case*, it could be argued, has stripped them of their privacy, since their story is now part of a judicial record—the record of this case.) We do not think it is an answer that Lemann got his facts from Ruby Daniels rather than from judicial records. The courts got the facts from Ruby. We cannot see what difference it makes that Lemann went to the source.

Ordinarily the evaluation and comparison of offensiveness and newsworthiness would be, like other questions of the applica-

tion of a legal standard to the facts of a particular case, matters for a jury, not for a judge on a motion for summary judgment. But summary judgment is properly granted to a defendant when on the basis of the evidence obtained in pretrial discovery no reasonable jury could render a verdict for the plaintiff, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986), and that is the situation here. No modern cases decided after *Cox*, and precious few before, go as far as the plaintiffs would have us go in this case. Almost all the recent cases on which they rely, such as *Capra v. Thoroughbred Racing Ass'n of North America, Inc.*, 787 F.2d 463 (9th Cir.1986) (per curiam); *Hawkins by Hawkins v. Multimedia, Inc.*, 288 S.C. 569, 344 S.E.2d 145 (1986), and *Times Mirror Co. v. Superior Court*, 198 Cal.App.3d 1420, 244 Cal.Rptr. 556, 564 (1988), involve the vindication of paramount social interests, such as the protection of children, patients, and witnesses—interests not involved in this case. The plaintiffs' best post-*Cox* cases are *Vassiliades v. Garfinckel's, supra*, and *Huskey v. National Broadcasting Co.*, 632 F.Supp. 1282, 1290–92 (N.D.Ill.1986), the former involving before-and-after photos of a face lift, the latter involving television pictures of a prisoner dressed only in gym shorts. Photographic invasions of privacy usually are more painful than narrative ones, and even partial nudity is a considerable aggravating factor. *Vassiliades* also involved the special issue of patient rights, though it was not emphasized by the court.

Illinois has been a follower rather than a leader in recognizing claims of invasion of privacy. *Lovgren v. Citizens First National Bank*, 126 Ill.2d 411, 128 Ill.Dec. 542, 534 N.E.2d 987 (1989); *Leopold v. Levin, supra*, 259 N.E.2d at 254; *Miller v. Motorola, Inc.*, 202 Ill.App.3d 976, 148 Ill.Dec. 303, 560 N.E.2d 900 (1990); *Eick v. Perk Dog Food Co.*, 347 Ill.App. 293, 106 N.E.2d 742, 743 (1952); *Douglass v. Hustler Magazine, Inc.*, supra, 769 F.2d at 1133, 1138; *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.2d 1176, 1183 (7th Cir.1993). The plaintiffs are asking us to innovate boldly in the name of the Illinois courts, and such a request is better addressed to those courts than to a federal court. If the plaintiffs had filed this case in an Illinois state court and it had been removed to the federal district court, they would have had no choice, and then we would have been duty-bound to be as innovative as we thought it plausible to suppose the Illinois courts would be. But the plaintiffs filed this suit in the district court originally—they *chose* the federal forum. And we have said before and will say again that plaintiffs who seek innovations in state law are ill advised to choose a federal court as their forum. *Anderson v. Marathon Petroleum Co.*, 801 F.2d 936, 942 (7th Cir.1986); *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370 (7th Cir.1985). To any suggestion that the outer bounds of liability should be left to a jury to decide we reply that in cases involving the rights protected by the speech and press clauses of the First Amendment the courts insist on firm judicial control of the jury. For the general principle, see *New York Times Co. v. Sullivan*, 376 U.S. 254, 285, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964); *Greenbelt Cooperative Publishing Association, Inc. v. Bresler*, 398 U.S. 6, 11, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6 (1970), and *Bose Corp. v. Consumer Union*, 466 U.S. 485, 505–11, 104 S.Ct. 1949, 1962–65, 80 L.Ed.2d 502 (1984); for its application in privacy cases, see *Anonsen v. Donahue, supra*, 857 S.W.2d at 704–06; *Gilbert v. Medical Economics Co., supra*, 665 F.2d at 309–10 n. 1, and *Campbell v. Seabury Press, supra*, 614 F.2d at 397. The publication of books is not at the sufferance of juries.

Does it follow, as the Hayneses' lawyer asked us rhetorically at oral argument, that a journalist who wanted to write a book about contemporary sexual practices could include the intimate details of named living persons' sexual acts without the persons' consent? Not necessarily, although the revelation of such details in the memoirs of former spouses and lovers is common enough and rarely provokes a lawsuit even when the former spouse or lover is still alive. The core of the branch of privacy law with which we have been dealing in this case is the protection of those intimate physical details the publicizing of which would be not merely embarrassing

and painful but deeply shocking to the average person subjected to such exposure. The public has a legitimate interest in sexuality, but that interest may be outweighed in such a case by the injury to the sensibilities of the persons made use of by the author in such a way. *Restatement (Second) of Torts, supra,* § 652D, comment h. At least the balance would be sufficiently close to preclude summary judgment for the author and publisher. *Miller v. Motorola, Inc.,* 202 Ill.App.3d 976, 148 Ill.Dec. 303, 306, 560 N.E.2d 900, 903 (1990); *Garner v. Triangle Publications, Inc.,* 97 F.Supp. 546, 550 (S.D.N.Y.1951).

The judgment for the defendants is AFFIRMED.