**Deon L. THOMAS, Plaintiff–Appellant,**

v.

**Bruce PEARL, individually and in his representative capacity as Assistant Basketball Coach of the University of Iowa, Defendant–Appellee.**

No. 92–2709.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 22, 1993.

Decided July 1, 1993.

Rehearing Denied July 30, 1993.

Thomas R. Kelso, J. Steven Beckett (argued), Carol A. Dison, Beckett & Crewell, Urbana, IL, for plaintiff-appellant.

John M. Parmeter (argued), Bonnie J. Campbell, Gordon E. Allen, Iowa Atty. General's Office, Des Moines, IA, for defendant-appellee.

Before CUMMINGS, CUDAHY and ROVNER, Circuit Judges.

CUMMINGS, Circuit Judge.

Six-foot-nine-inch All–American Deon Thomas was the kind of high school basketball prospect who could make college coaches salivate—or worse. The University of Illinois was so eager to see Thomas wearing a Fighting Illini jersey that an assistant coach allegedly offered the high school student $80,000 and a Chevrolet, and promised to move his grandmother into a new apartment, if he would agree to accept the school's offer of a full scholarship.[1] The charges against Illinois were made public by a Big Ten rival college also interested in Thomas' talents on the court, the University of Iowa. The National Collegiate Athletic Association ("NCAA") investigated Iowa's charges and, though it dismissed the two most serious allegations about a car and cash, found a number of other violations including car loans by boosters and free tickets to NCAA tournaments. As punishment, the NCAA banned Illinois from the 1991 NCAA tournament, limited to two the number of basketball scholarships it could offer in 1991–1992 and 1992–1993, prohibited the school from playing outside the United States in 1991, and severely restricted recruiting. The school's internal investigation also led to a freeze on coaches' salaries.[2] Thomas, mean-

---

**1.** "Basketball Team Penalized After Recruiting Inquiry," N.Y. TIMES, Nov. 11, 1990 at A 52.

**2.** Mark Asher, "Illinois Basketball Gets Three Years' Probation; NCAA Cuts Illini Out of NCAA Tournament," WASH.POST, Nov. 8, 1990 at B3.

while, sat out his freshman year while the investigation was pending.

Now Thomas, seeking vindication of sorts, is suing Bruce Pearl, the assistant basketball coach at Iowa who first charged Illinois with offering illicit incentives to recruits.[3] According to Thomas, Pearl surreptitiously taped phone conversations he had with Thomas and Thomas' friends and relatives in violation of the federal wiretapping statute, 18 U.S.C. §§ 2510–2520, and the Illinois Eavesdropping Statute, 720 ILCS 5/14–1 through 5/14–9. Thomas filed a two-count complaint in Champaign County, Illinois. The defendant had it removed to federal court in the Central District of Illinois based on federal question jurisdiction. Because neither the federal nor the state wiretapping statutes apply to Pearl's conduct, we affirm the district court's grant of summary judgment in his favor. 793 F.Supp. 838.

In late 1988, Coach Pearl began efforts to recruit Thomas to the University of Iowa. As part of the negotiations, Thomas told Pearl about his dealings with other colleges and universities. According to a memo prepared for his superiors, Pearl learned from Thomas in December 1988 that an Illinois coach had offered to move the recruit's grandmother to a nicer apartment. "I asked Deon how he felt about the offer and also why he was telling me. He said that at first he was insulted. He prides himself on being honest and religious. However, the idea of helping his grandmother very much appealed to him" (defendant's supp. app. at 19). Pearl believed correctly that such an offer, if it had been made, violated NCAA regulations. Fred Mims, Associate Athletic Director at Iowa and the NCAA compliance officer on campus, gave Pearl a tape recorder with a telephone attachment and told the coach to document Thomas' statements. Between April and July 1989, Pearl made at least ten calls to Thomas or to Thomas' friends or relatives. During these conversations Thomas discussed the various perks, including cash, which had been offered to him and other recruits by the University of Illinois. According to Pearl's affidavit, Pearl played the tapes for just two individuals other than his superiors at Iowa: an NCAA enforcement officer, as he was required to do upon request under NCAA rules, and a University of Illinois attorney.

■ Thomas' first claim is that Pearl violated the federal law against wiretapping. That statute creates civil and criminal liability for intentionally intercepting or disclosing the contents of any "wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a)(c).[4] The district court found that the ban on wiretapping did not apply to Pearl's actions because of two exceptions in the law. We agree that the coach is not liable under § 2511, but our analysis differs significantly from the district court's. The wiretapping law's first exemption is for "a person acting under color of law * * * where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c). The district court found that,

---

3. Pearl is now head coach at Southern Indiana in Evansville and Thomas has gone on to become a successful player at Illinois.

4. The statute provides in part:
(1) Except as otherwise specifically provided in this chapter any person who—
   (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
      *   *   *   *   *   *
   (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; * * *

shall be punished * * *.

     *    *    *    *    *    *

(2) * * * (c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.
   (d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

as an assistant basketball coach at a state university, Pearl acted "under color of law" when he taped conversations with Deon Thomas and Thomas' friends and relatives. We disagree.

Traditionally—that is, before the Supreme Court's 1961 decision in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, overruled on other grounds, *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)—the phrase "under color of law" referred to state officials who exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941). See Eric H. Zagrans, "'Under Color of' *What* Law: A Reconstructed Model of Section 1983 Liability," 71 Va.L.Rev. 499, 500–501 (1985). In *Monroe* the Court found that color of law, as it is used in the Civil Rights Act of 1871, 42 U.S.C. § 1983, includes not just fully authorized acts by state officials but acts committed by officials exceeding their authority. 365 U.S. at 172, 81 S.Ct. at 476. Thus, for example, a person beaten by the police may allege a constitutional infringement against the officer even though the beating was not authorized or sanctioned in any way by the police department. At times the connection between the state and the person acting under color of law has been quite attenuated—for example, a paid informer who receives the aid of police officers is held to the same constitutional standards as the officers themselves. *Hoffa v. United States*, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966). *Polk County v. Dodson*, 454 U.S. 312, 318–319, 102 S.Ct. 445, 449–450, 70 L.Ed.2d 509 (1981), which held that a public defender does not act under color of law, is the only Supreme Court case in which a government employee performing tasks essential to his position was exempt from § 1983 liability. *West v. Atkins*, 487 U.S. 42, 50, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988).

The phrase "under color of law" in § 1983 actions is now so broad that it means the same thing as "state action." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935, 102 S.Ct. 2744, 2752, 73 L.Ed.2d 482 (1982). Normally, mere employment by the state is sufficient to convert a defendant into a state actor. *Id.* at 935–936, n. 18, 102 S.Ct. at 2752–2753, n. 18. That, of course, includes a basketball coach who receives paychecks from the state treasury. Clearly, Pearl as a state employee would have acted under color of law if Thomas were alleging that the coach violated his constitutional rights in a § 1983 action. But that is not this case. Rather, Thomas alleges that Pearl violated § 2511 of the federal wiretapping act, and Congress has not said whether color of law means the same thing in § 2511 as it does in § 1983. The district judge thought so. According to the trial court, state action and color of law are equivalent in the wiretapping context because "the Supreme Court had already attributed to the phrase 'under color of law' a meaning basically synonymous with state action, and Congress presumably knew of that meaning and did not object to it." We do not agree. Even if it were evident that congressional silence signalled active approval of the case law interpreting color of law, that case law is ambiguous at best because nearly all decisions have been quite careful to restrict their generous definitions of color of law to the civil rights arena.

In *Lugar*, for example, the Supreme Court emphasized that it was equating state action and color of law in § 1983 only because to do otherwise "would substantially undercut the congressional purpose in providing the § 1983 cause of action." *Id.* at 935, 102 S.Ct. at 2752. And in discussing the meaning of the phrase in *West v. Atkins*, the Court carefully noted that state action equals color of law only in the special circumstances of § 1983 suits. 487 U.S. at 49, 108 S.Ct. at 2255. Moreover, the majority opinion in *Lugar* stated in a footnote that state action and color of law are not always equivalent just because they are the same for purposes of § 1983:

> [A]lthough we hold in this case that the under-color-of-state-law requirement does not add anything not already included within the state-action requirement of the Fourteenth Amendment, § 1983 is applicable to other constitutional provisions and statutory provisions that contain no state-

action requirement. Where such a federal right is at issue, the statutory concept of action under color of state law would be a distinct element of the case not satisfied implicitly by a finding of a violation of the particular federal right.

457 U.S. at 935 n. 18, 102 S.Ct. at 2753 n. 18.

Moreover, the Civil Rights Act of 1871, unlike the wiretapping act, is a remedial statute intended to be as broad as the Fourteenth Amendment. *Id.* at 934, 102 S.Ct. at 2752. Liberal interpretations of § 1983's color of law language have the effect of increasing the number of people who can sue. By giving a wide reading to the terms of the statute, the Supreme Court narrowed (if not almost completely eliminated) the immunity enjoyed by government officials in favor of individuals who have been allegedly harmed by the state. Contrast this with the wiretapping act where color of law is used not to create a cause of action for injured plaintiffs but to exempt certain state officials from liability for their behavior. In this context, the broadest reading of color of law would hinder, rather than further the essential purpose of the act: to protect individuals from invasions of privacy. See *Gelbard v. United States,* 408 U.S. 41, 47–50, 92 S.Ct. 2357, 2360–2362, 33 L.Ed.2d 179 (1972).

In the wiretapping setting, conflating color of law and state action would confer on every last employee of federal, state and local government a free pass to record conversations without the second party's consent. Most cases that arise under the wiretapping act involve law enforcement officers gathering evidence against suspected criminals. The exemption in § 2511 for officials acting under color of law was evidently designed to aid police in ensnaring lawbreakers, not to unleash upon society millions of government workers—armed with recording devices strapped to their phones—seeking to invade the privacy of individuals neither suspected nor accused of committing crimes. Also, if color of law means the same thing in § 2511 that it means in § 1983, police officers who

secretly taped conversations without a warrant or the approval of their superiors would be free from criminal and civil liability. That cannot be what Congress intended.

We do not necessarily limit the "under color of law" language in § 2511 to law enforcement officers acting within the scope of their authority. Yet there must be some logical and reasonable connection between the government worker's job description and eavesdropping. Society simply has no expectation that basketball coaches will wiretap their conversations with high school recruits, no matter the extenuating circumstances. Pearl argues that he acted with the approval of his superiors, but that is beside the point. We do not expect college administrators and athletic directors to wiretap, or sanction wiretaps, any more than basketball coaches. Thus the district court's conclusion that Pearl acted under color of law cannot stand.

However, a second provision of § 2511 relieves any eavesdropper from liability who does not surreptitiously record conversations "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or any State," where at least one party to the conversation consents.[5] This means Thomas must show that Pearl either intended to break the law or commit a tort against him in order to prove a violation of the federal statute. We agree with Judge Baker that Thomas has failed to establish either point, although our analysis again differs slightly from the district court's.

Thomas does not allege that Pearl has broken any laws other than the wiretapping law itself, which we presume does not destroy the exemption. Instead, Thomas argues that Pearl robbed him of his privacy and defamed him and should therefore be liable under § 2511. The complaint supports these contentions only in the most vague and haphazard manner. The district court dismissed Thomas' allegations almost in passing because he did not try to establish the elements of a cause of action in tort. Although

---

**5.** This sweeping provision drowns the rest of the statute and makes the first exception for persons acting under color of law redundant. As we noted above, one who acts under color of law in

this context is by definition not breaking the law or committing a tort and is thus exempt from liability under either clause.

inartful, Thomas' complaint could be read to state a cause of action for any of three privacy torts: (1) intrusion upon the seclusion of another; (2) publicity given to private life; and (3) publicity placing a person in a false light. *Lovgren v. Citizens First Nat'l Bank*, 126 Ill.2d 411, 416, 128 Ill.Dec. 542, 534 N.E.2d 987 (1989).

█ The tort of intruding upon the seclusion of another is aimed at discomfort caused by the intrusion itself—for example, someone enters your bedroom, *Byfield v. Candler*, 33 Ga.App. 275, 125 S.E. 905, 906 (1924), opens your mail, *Birnbaum v. United States*, 588 F.2d 319, 323 (2d Cir.1978), or makes repeated and unwanted telephone calls to you, *Harms v. Miami Daily News, Inc.*, 127 So.2d 715, 716–717 (Fla.App.1961). Eavesdropping by wiretapping may itself constitute such an invasion of privacy. *Lovgren*, 126 Ill.2d at 417, 128 Ill.Dec. 542, 534 N.E.2d 987. In this instance, however, Thomas was harmed if at all not by the telephone calls themselves (since he was a willing party) or even by the recording, but by the publication of what he said in the conversations. And under *Lovgren*, a plaintiff fails to state a claim for invaded seclusion if the harm flows from publication rather than the intrusion. *Id.*

█ Nor is Thomas able to mount a claim that Pearl caused him unwarranted publicity, a second variety of privacy tort recognized in Illinois. To state such a cause of action, the plaintiff must prove that the defendant disclosed a personal matter in a way that would be highly offensive to a reasonable person and which is not a legitimate subject of public concern. Restatement (Second) of Torts § 652D (1977). Even assuming that Pearl's revelations would be highly offensive to a reasonable person, recruiting abuses by a public university are undoubtedly a matter of public interest. Pearl's intent was not to embarrass Thomas but to call attention to unfair and illegal practices by a rival university.

█ Finally, Thomas has failed to prove, or even suggest, how Pearl's actions put him in a false light. To state this cause of action a plaintiff must show that he was placed in a false light because of defendant's action, that the publicity would be highly obnoxious to a reasonable person, and that the defendant acted either knowing that the statements were false or with reckless disregard for the truth. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 17–18, 180 Ill.Dec. 307, 607 N.E.2d 201 (1992). A doctored quotation may defame a person by attributing untrue factual assertions to the speaker or by suggesting a manner of speaking or a personal trait the speaker does not hold. *Masson v. New Yorker Magazine, Inc.*, —— U.S. ——, ——, 111 S.Ct. 2419, 2430, 115 L.Ed.2d 447 (1991). Yet we have no affidavits suggesting that Pearl's depiction of his conversations with Thomas were false; we have only an unsupported allegation that the quotes were not published in their entirety. Thus the coach could not have put Thomas in a false light. A party's accurate quoting of another's statement cannot defame the speaker's reputation since the speaker is himself responsible for whatever harm the words might cause. For similar reasons, Thomas would be unable to establish a successful defamation claim against Pearl because one element of defamation is that the assertion about the plaintiff be false. Restatement (Second) of Torts § 558 (1977). The fact that a statement is true, or in this case accurately quoted, is an absolute defense to a defamation action. Restatement (Second) of Torts § 581A (1977).[6] Because Thomas cannot prove that Pearl intended to commit a tort

---

6. Pearl might also have a privilege defense to a defamation suit because according to his affidavit the only two people (other than his superiors) for whom he played the tapes of his conversations were a lawyer for the University of Illinois and an NCAA official. It is a defense that the communication was privileged, and both communications compelled by law and communications to a lawyer in anticipation of potential litigation are protected. *Becker v. Philco Corp.*, 372 F.2d 771, 775 (4th Cir.1967), certiorari denied, *389 U.S. 979*, 88 S.Ct. 408, 19 L.Ed.2d 473; Restatement (Second) of Torts § 587 (1977). Whether Pearl's duty to report violations to the NCAA constitutes a legal obligation, and whether an NCAA investigation would count as an anticipated legal proceeding, are questions we need not address because of our resolution of other issues.

against him, the coach is exempt from liability under the federal act.

Having failed to establish a federal violation, Thomas turns for solace to Illinois. Indeed, its eavesdropping statute at first glance appears broader than the federal law. The Illinois act provides civil penalties for a person who "uses an eavesdropping device to hear or record all or part of any conversation unless he does so with the consent of *all* of the parties to such conversation" (emphasis added). 720 ILCS 5/14–2. In *People v. Beardsley,* 115 Ill.2d 47, 104 Ill.Dec. 789, 503 N.E.2d 346 (1986), however, the Illinois Supreme Court interpreted the universal consent requirement to apply only to the surreptitious taping of a conversation by someone who is not a party to that conversation. Thus in *Beardsley* a defendant sitting in the back of a police cruiser did not eavesdrop when he recorded the conversation of two officers in front because the officers had no expectation of privacy. As the state court said:

> [T]he eavesdropping statute was intended to protect individuals from the *surreptitious* monitoring of their conversations by the use of eavesdropping devices. * * * The statute is based on the assumption that if the parties to a conversation act under circumstances which entitle them to believe that the conversation is private and cannot be heard by others who are acting in a lawful manner, then they should be protected in their privacy.

*Id.* at 53, 104 Ill.Dec. 789, 503 N.E.2d 346. Although the instant case differs from *Beardsley* in that the plaintiff did not indicate any lack of interest in privacy by discussing personal matters in front of others, he did speak freely to Pearl, the person with the recording device. Under *Beardsley,* Pearl did not eavesdrop illicitly on Thomas because Thomas knew he was talking to Pearl. As the Illinois Supreme Court said, "In essence, the conduct at which the statute is aimed is that of listening in secret to what is said in private." *Id.* at 58, 104 Ill.Dec. 789, 503 N.E.2d 346. Pearl listened, but not in secret. We admit this is an odd interpretation of the Illinois statute, but even the plaintiff concedes that *Beardsley* is four-square

against him. His only argument is that the case is wrongly decided. Even if we were to agree, we are not at liberty to disregard an Illinois Supreme Court decision interpreting an Illinois statute. 28 U.S.C. § 1652.

Since Thomas has failed to state a claim under either the federal or Illinois wiretapping laws, the decision of the district court is affirmed.