**J.H. DESNICK, M.D., Eye Services, Ltd., A Professional Corporation; Mark A. Glazer, M.D., and George V. Simon, M.D., Plaintiffs,**

v.

**CAPITAL CITIES/ABC, INC.; ABC News Prime Time; John Entine; and Sam Donaldson, Defendants.**

No. 93 C 6534.

United States District Court,
N.D. Illinois,
Eastern Division.

April 1, 1994.

Dan K. Webb, Steven F. Molo and Julie A. Bauer, Winston & Strawn, Chicago, IL, for plaintiffs.

Michael M. Conway, Mary Kay McCalla, Jennifer M. Baratta and James M. Falvey, Hopkins & Sutter, Chicago, IL for defendants American Broadcasting, Inc., Sam Donaldson and Jon Entine.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Before the Court is Defendants' Motion to Dismiss the Plaintiffs' Complaint.

## ALLEGED FACTS

This case arises out of the preparation and broadcast of a television segment concerning cataract surgery for a program entitled *PrimeTime Live* which is produced by the Defendants. On March 22, 1993, John Entine, producer of *PrimeTime Live*, contacted Plaintiff Dr. James Desnick about an interview concerning a segment regarding cataract surgery. Dr. James Desnick owns Eye Services, Ltd., also known as the Desnick Eye Center, which provides ophthalmologic medical and surgical services.

According to Plaintiffs' Complaint, when Entine and Desnick spoke, Entine assured Desnick that the segment would focus on ophthalmological practices which market their services to senior citizens and would not involve "surveillance 'ambush' journalism techniques or 'undercover' techniques." (Complaint at ¶¶ 20–21.) Based on this alleged agreement between Entine and Desnick, Desnick allowed Entine to interview medical staff personnel and film live cataract surgery at the Desnick Eye Center in Chicago. *Id.* at ¶ 25. Desnick also gave Entine an informational videotape used by the Eye Center for patient information. *Id.*

Shortly after Entine's visit to the Eye Center, Desnick learned that the Defendants had hired "undercover" patients to visit two of the Desnick Eye Center's branch offices located in Kenosha, Wisconsin and Munster, Indiana. *Id.* at ¶ 27. These "undercover" patients were accompanied by another person posing as a friend or relative who carried concealed videotaping and audio recording equipment. *Id.* at ¶ 33.

Furthermore, prior to the broadcast on June 10, 1993, Plaintiffs learned that Defendants were allegedly relying upon information provided by a former employee of the Desnick Eye Center, Paddy Kalish. *Id.* at ¶ 36. Plaintiffs informed Defendants that Kalish was biased and had previously disseminated false information about the Desnick Eye Center. *Id.* at ¶ 37. Kalish appeared in the June 10, 1993 broadcast and stated that he watched a technician tamper with the auto-refractor machines at the Desnick Eye Center.[1] *Id.* at ¶ 38. Kalish also stated that the Defendants routinely tampered with auto-refractors when older patients came in for eye exams so that it would appear that they had cataracts. *Id.* Plaintiffs allege that the Defendants, with reckless disregard for the truth and with actual malice, broadcast Kalish's defamatory statements that Plaintiffs tampered with their auto-refractors. *Id.* at ¶ 43.

Based on the alleged facts recounted above, Plaintiffs bring a seven count Complaint alleging trespass (Count I), invasion of privacy (Count II), wiretapping in violation of 18 U.S.C. § 2511 and Wisconsin Statute 968.31 (Counts III and IV), fraud (Count V),

---

1. An auto-refractor machine is used by ophthalmologists to detect glare and diagnose eye and vision problems.

breach of contract (Count VI) and defamation (Count VII).

**ANALYSIS**

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must view the complaint in the light most favorable to the plaintiff and the complaint's allegations must be accepted as true. *Richardson v. Shearson/American Express Co., Inc.,* 573 F.Supp. 133, 134 (N.D.Ill.1983) citing C. Wright & A. Miller, *Federal Practice & Procedure* § 1357 at 594 (1969). Thus, the complaint cannot be dismissed "unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts ... which would entitle [him] .to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

*Count I—Trespass*

■ In Count I, Plaintiffs seek to recover damages for Entine's visit to Desnick Eye Center's Chicago Office and for at least seven "undercover" patients' visits to Desnick Eye Center's Wisconsin and Indiana offices. Defendants assert that Plaintiffs cannot state a claim for trespass because Plaintiffs consented to the entries of Entine and the "undercover" patients.

■ A trespass is an entry into another's land without permission, invitation or other right. *Chicago Title & Trust Co. v. Weiss,* 238 Ill.App.3d 921, 179 Ill.Dec. 78, 83, 605 N.E.2d 1092, 1097 (2nd Dist.1992); *Prahl v. Brosamle,* 98 Wis.2d 130, 295 N.W.2d 768, 773 (1980); *Cullison v. Medley,* 570 N.E.2d 27, 29 (Ind.1991). While Plaintiffs do not deny that they consented to the entries of Entine and the "undercover" patients, they argue that they would not have consented if Entine and the patients "had revealed their true purpose." (Complaint ¶ 49.) Plaintiffs assert that consent is not a valid defense to an action for trespass if the consent was fraudulently induced.

In support of their assertion, Plaintiffs cite *Prahl v. Brosamle,* 98 Wis.2d 130, 295 N.W.2d 768 (1980). In *Prahl,* the court held that the plaintiff could bring an action for trespass against a television reporter where the reporter entered the plaintiff's land to film police officers confiscating plaintiff's guns and interviewing plaintiff. *Id.,* 295 N.W.2d at 773. Instrumental to the *Prahl* court's holding was the reporter's failure to request or receive the plaintiff's permission to enter the premises. *Id.* at 778–779. Thus, the facts of *Prahl* are distinguishable from the facts of the present case where Plaintiffs do not deny that they consented to the entries of Entine and the "undercover" patients. *Le Mistral, Inc. v. Columbia Broadcasting System,* 61 A.D.2d 491, 493, 402 N.Y.S.2d 815 (1978), can be similarly distinguished.

Although *Belluomo v. Kake T.V. & Radio,* 3 Kan.App.2d 461, 474, 596 P.2d 832 (1979) supports Plaintiff's argument that, "[i]f the purported consent was fraudulently induced, there was no consent," this Court finds the rationale of *Baugh v. CBS, Inc.,* 828 F.Supp. 745 (N.D.Cal.1993) more persuasive. In *Baugh,* the plaintiff admitted that she consented to the entry of the camera crew into her home and to their videotaping. *Id.* at 756. However, she argued that her consent was invalid because it was induced by the defendants' misrepresentations. *Id.* The *Baugh* court held that where actual consent is given, even if it is fraudulently induced, there can be no trespass. *Id.* at 757. *See also, Miller v. NBC,* 187 Cal.App.3d 1463, 1480, 232 Cal.Rptr. 668 (1987) (holding that where there is a consensual entry, there is no tort because lack of consent is an element of the theory underlying tort). While the Plaintiffs in the instant case may have a remedy based on fraud or misrepresentation, they cannot bring an action for trespass. Accordingly, Count I of the Complaint is dismissed for failure to state a claim on which relief can be granted.

*Count II*

In Count II of their Complaint, Plaintiffs assert that the Defendants and their agents "intruded into the private spaces of the Desnick Eye Center in a highly offensive nature." (Complaint ¶ 54.) The Plaintiffs state further that the facilities, especially the examination rooms of the Desnick Eye Center, are places that the Plaintiffs and any reasonable person would consider private. (Complaint at ¶ 53.) Finally, the Plaintiffs allege that the Defendants' intrusive invasion of

privacy violated the doctor-patient relationship and jeopardized the Plaintiffs ability to communicate openly with their patients. (Complaint at ¶ 55.)

 Initially, this Court notes that Plaintiff Eye Services Ltd., a corporation, cannot bring an action for invasion of privacy. The right to privacy is a personal right which courts have not extended to protect corporations. *CNA Financial Corp. v. Local 743 of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 515 F.Supp. 942, 946 (N.D.Ill. 1981) (stating "[m]any courts that have considered the question have concluded that a corporation cannot maintain an action for invasion of the right to privacy and we believe that this represents the better reasoned approach.") Plaintiffs argue that Eye Services is not an ordinary corporation but rather a professional corporation, and thus Eye Services should be treated like a partnership for privacy purposes. However, Plaintiffs provide no support for their assertion other than the citation of *H & M Associates v. City of El Centro*, 109 Cal.App.3d 399, 167 Cal. Rptr. 392, 399 (4th Dist.1980) which held that a limited *partnership* could bring a claim for invasion of privacy. Thus, this Court concludes that Eye Services cannot maintain an action for invasion of the right to privacy.

 Unlike corporate Plaintiff Eye Service, this Court cannot dismiss the individual Plaintiffs', Dr. Mark Glazer and Dr. George Simon, action for invasion of privacy so readily. The Restatement (Second) of Torts describes the tort of intrusion upon seclusion in the following manner:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B at 378 (1977). The tort of intrusion upon seclusion depends upon some "type of highly offensive prying into physical boundaries or affairs of another person." *Lovgren v. Citizens First Nat. Bank of Princeton*, 126 Ill.2d 411, 128 Ill.Dec. 542, 544, 534 N.E.2d 987, 989 (1989).[2] The basis of the tort is not publication or publicity but rather offensive prying into the domain of another. *Id.* The *Lovgren* court noted further that where the alleged offensive conduct and subsequent harm result from the defendant's act of publication, not from the act of prying, the plaintiff has not stated a claim for intrusion into seclusion. *Id.* In the present case, the offensive conduct and the subsequent harm resulted from the broadcast of *PrimeTime Live* which, according to the Plaintiffs falsely depicted Plaintiffs as unethical and unprofessional. (Complaint at ¶ 46.)

Count II of the Complaint does attempt to allege a harm other than that which resulted from the broadcast. In paragraph 55 of the Complaint states,

> The intrusive invasion of privacy was injurious to the medical practices of the Plaintiffs in that it denigrated, violated and trivialized the doctor-patient relationship, making Plaintiffs apprehensive of such intrusions and jeopardizing and inhibiting their ability to communicate openly with their patients.

(Complaint ¶ 55.)

Strangely, Plaintiffs suggest that the alleged intrusion was offensive to the doctors because it denigrated and violated the privacy and privilege of the doctor-patient relationship. However, as Defendants aptly note, the privacy and privilege of the doctor-patient relationship is for the benefit of the patient, not the doctor. "The purpose of the privilege is to encourage free disclosure between the physician and the patient and to protect the patient from the embarrassment

---

**2.** In *Lovgren,* the Illinois Supreme Court stated that their discussion of the tort of invasion of seclusion did not suggest that the Illinois Supreme Court would necessarily recognize such a cause of action. 128 Ill.Dec. at 544, 534 N.E.2d at 989. Whether or not Illinois recognizes a cause of action for invasion of seclusion is immaterial since the invasion of privacy for which the individual Plaintiffs seek recovery occurred in Wisconsin and Indiana.

Neither party cites any Wisconsin or Indiana case discussing the tort nor do they suggest that Wisconsin or Indiana would analyze a claim for invasion of seclusion any different than Illinois.

and invasion of privacy that disclosure would entail." *People v. Herbert,* 108 Ill.App.3d 143, 63 Ill.Dec. 892, 896, 438 N.E.2d 1255, 1259 (1st Dist.1982), *cert. denied* 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983). *See also,* Wis.Stat. § 905.04; Ind.Code § 34–1–14–5. While the doctor-patient privilege would be violated and communications between doctors and patients chilled if the doctor clandestinely filmed and recorded a medical examination or consultation, the same cannot be said when the patient chooses do the filming or recording. Since Drs. Glazer and Simon have not alleged a harm, other than that resulting from the broadcast, which they incurred as a result of the Defendants' alleged offensive conduct, they have failed to state a claim for invasion of seclusion. Accordingly, Count II of the Complaint must be dismissed.

*Counts III and IV—Violation of the Wiretapping Statutes*

■ In Counts III and IV of their Complaint, Plaintiffs allege that the Defendants violated the federal wiretapping statute, 18 U.S.C. § 2511, and Wisconsin's wiretapping statute, Wis.Stat. § 968.31. Plaintiffs state that Defendants recorded oral communications made by Drs. Simon and Glazer on at least seven different occasions without the doctors' consent. (Complaint at ¶ 58.)

Defendants assert that the wiretapping statutes do not apply because the communications were recorded with the consent of one of the parties to the conversation, the undercover patients.[3,4] Plaintiffs avoid the one party consent rule by alleging that the oral communications were intercepted for a tortious purpose and in the course of tortious

conduct. *See,* 18 U.S.C. § 2511(2)(d); Wis. Stat. § 968.31; Complaint at ¶ 60.

In response, Defendants argue that as the Plaintiffs fail to specify which tortious acts the Defendants intended to commit when they made the recordings, the Plaintiffs claims must fail as a matter of law. Plaintiffs counter that they have properly alleged that the Defendants intercepted oral communications in violation of the wiretapping statutes for the purpose of committing trespass and invasion of privacy. However, as this Court has dismissed the Plaintiff's action for trespass and for invasion of privacy; Plaintiffs' allegations that Defendants violated the wiretapping statutes must also fail.

In *Thomas v. Pearl,* 998 F.2d 447, 452 (7th Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 688, 126 L.Ed.2d 655 (1994), a basketball player brought a lawsuit against a former assistant basketball coach at the University of Iowa claiming that the coach violated the federal wiretapping statute by recording his telephone calls with the player while the coach was attempting to recruit the player. The Seventh Circuit granted the coach's motion for summary judgement because the plaintiff had not alleged that the coach intended to commit criminal or tortious acts when making the recordings. *Id.*

Similar to the present case, the *Thomas* court found that the plaintiff's complaint could be read to include a cause of action for intrusion upon the seclusion of another and that eavesdropping by wiretapping may constitute such an invasion. *Id.* However, relying on *Lovgren v. Citizens First Nat'l Bank,* 126 Ill.2d 411, 416, 128 Ill.Dec. 542, 534 N.E.2d 987 (1989), the *Thomas* court held that the plaintiff was not harmed by the

---

3. The federal wiretapping statute provides in pertinent part,

It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication ... unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the ... laws of the United States or any State. 18 U.S.C. § 2511(2)(d).

4. The Wisconsin wiretapping statute provides in relevant part,

It is not unlawful under §§ 968.28 to 968.33 ... for a person not acting under color of law to intercept a wire, electronic or oral communication where the person is a party to the communication ... unless the communication is intercepted for the purpose of committing any criminal or tortious act in violation of the ... laws of the United States or of any state or for the purpose of committing any other injurious act. Wis.Stat. § 968.31(2)(c).

recording or by the telephone calls themselves, but rather by the publication of what he said. As a plaintiff cannot state a claim for invasion of seclusion if the harm flows from the publication, the *Thomas* court held that the plaintiff could not prove that the coach intended to commit a tortious act when he made the recordings. *Thomas*, 998 F.2d at 452. Analogously, as Drs. Simon and Glazer have failed to allege a harm resulting from the filming and recording of their conduct and conversations, other than the publication, they have not stated a claim for invasion of seclusion, and thus cannot prove that the Defendants intended to commit a tortious act when they made the video and audio recordings. Consequently, Count III must be dismissed for failure to state a claim.

The language of the Wisconsin wiretapping statute differs slightly from that of the federal wiretapping statute. The Wisconsin statute states that it is "not unlawful to intercept a wire, electronic or oral communication where the person is a party to the communication ... unless the communication is for the purpose of committing any criminal or tortious act ... or *for the purpose of committing any other injurious act.*" Wis.Stat. § 968.31. (emphasis added) However, since Plaintiffs fail to allege any injurious act other than the tortious acts which have previously been dismissed, this Court must grant Defendants' Motion to Dismiss Count IV.

*Count V—Fraud*

■ In Count V, Plaintiff Eye Services alleges that Defendant Entine made false statements to Eye Services when he promised Eye Services that the segment would not focus on Eye Services or involve "undercover" surveillance or "ambush" journalism. (Complaint at ¶ 21.) Eye Services states further that in reliance on Entine's representations, it agreed to provide the Defendants with access to the Desnick Eye Center for the purpose of interviewing doctors, videotaping live surgery and obtaining background information.

■ Under Illinois law, a promise to perform an act, though accompanied at the time with an intention not to perform it, is not such a false representation that will constitute fraud. *Serig v. South Cook County*

*Service Corp.*, 581 F.Supp. 575, 579 (N.D.Ill. 1984). The only exception to this rule is "where the false promise or representation of intention of future conduct is the scheme or device to accomplish the fraud." *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir.1992) (citing *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 13 Ill.Dec. 699, 706, 371 N.E.2d 634, 641 (1977)). The scheme exception applies where "a party makes a promise of performance, not intending to keep the promise but intending for another person to rely on it, and where the other party relies on it to its detriment." *Bower*, 978 F.2d at 1011 (citing *Concord, Industries, Inc. v. Harvel Industries Corp.*, 122 Ill.App.3d 845, 78 Ill.Dec. 898, 462 N.E.2d 1252, 1255 (1984)).

The burden on a plaintiff claiming promissory fraud is deliberately high.

In order to survive the pleading stage, a claimant must be able to point to specific objective manifestations of fraudulent intent—a scheme or device. If he cannot, it is in effect presumed that he cannot prove facts at trial entitling him to relief. If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed.

*Bower*, 978 F.2d at 1012 (citing *Hollymatic Corp. v. Holly Systems, Inc.*, 620 F.Supp. 1366, 1369 (N.D.Ill.1985)).

Defendants charge that the Plaintiffs have not met the requirement that specific objective manifestations of fraudulent intent be pled. This Court finds that the Complaint demonstrates otherwise.

In their Complaint, Plaintiffs allege that Defendants never intended to prepare a fair and objective report, but rather "Defendants embarked on a scheme to infiltrate phony patients into the medical practice operated by the Plaintiffs, hoping to entrap Plaintiffs on videotape in unethical or illegal actions." (Complaint ¶ 2.) According to the Plaintiffs, Entine made false promises that the *Prime-Time Live* segment would not focus on Eye Services and would not involve surveillance "ambush" journalism techniques in order to gain access to information, property and per-

sonnel which the Plaintiffs would not have provided had they not been mislead. (Complaint at ¶¶ 20–23, 26, 66–67.) After Entine's visit to the Chicago Desnick Eye Center, the Plaintiffs allegedly learned that "undercover" patients, at the direction of Entine, were sent to THE Desnick Eye Center's Wisconsin and Indiana offices with concealed cameras and recording devices. (Complaint at ¶¶ 27–31.) Finally, Plaintiffs state that Defendants used the materials they obtained through their misrepresentations to supplement a broadcast which indicated that certain Eye Services' employees had "rigged" auto-refractor machines to convince healthy patients that they needed cataract surgery. (Complaint at ¶¶ 35, 38–40.) As the Plaintiffs have pled a scheme to defraud with sufficient particularity, Count V cannot be dismissed on that basis.

 Defendants assert that, even if the Plaintiffs have sufficiently pled a scheme to defraud, the Court must still dismiss Count V because Plaintiffs have failed to sufficiently plead damages resulting from the reliance on the misrepresentations. In a fraud case, "a plaintiff must show that, had it not been for the fraud, he would have been spared an injury and thus been better off." *Midwest Commerce Banking v. Elkhart City Centre*, 4 F.3d 521, 524 (7th Cir.1993) (citing *Stromberger v. 3M Co.*, 990 F.2d 974, 976–79 (7th Cir.1993)).

If this Court compares the situation the Plaintiffs would have been in had there been no fraud to the situation the Plaintiffs found themselves in after the alleged fraud, it is evident that any injury the Plaintiffs allegedly suffered was not caused by the fraud. Eye Services states that the false statements made by Entine induced Eye Services to cooperate with Entine allowing Entine to videotape the interior of the Desnick Eye Center's Chicago Office, to interview doctors, to videotape live cataract surgery and to view Eye Center's informational videotape used for patient education. (Complaint at ¶¶ 22–25, 66–67.) As a result of its reliance on Defendants' misrepresentations, Eye Services claims that it was "deprived of its privacy and right to control access to its personnel and premises." *Id.* at 69. Since Eye Servic-

es had total control over what it told and showed Entine during Entine's visit to the Desnick Eye Center in Chicago, the Court presumes that Eye Services is claiming that, due to its reliance on Entine's misrepresentations, it was deprived of its privacy and right to control access to its personnel and premises at the Indiana and Wisconsin offices. With regard to the deprivation of privacy and right to control access at the Indiana and Wisconsin offices, Plaintiffs cannot show that, had it not been for the fraud, they would not have suffered the alleged injury. Plaintiffs cannot claim that, in reliance on Entine's misrepresentations, they had conversations with and performed eye examinations in Indiana and Wisconsin on "undercover" patients who carried video and tape recording equipment. Entine requested interviews and filming in Chicago.

Contrary to Plaintiffs assertion, *Europlast Ltd. v. Oak Switch Systems, Inc.*, 10 F.3d 1266, 1272–73 (7th Cir.1993) is distinguishable. In *Europlast,* a seller of computer keyboards brought an action against the buyer for fraudulent misrepresentation. The seller alleged that the buyer fraudulently misrepresented its interest in acquiring the seller in order to induce the seller to turn over its financial statements. *Id.* According to the seller, the buyer used the seller's confidential financial information to determine whether it should start its own plastic molding division and to comparison shop for a less expensive plastic parts supplier. *Id.* at 1272. The Seventh Circuit held that a sufficient nexus existed between the buyer's false statement that it was interested in acquiring the seller and the seller's loss of the buyer's business. *Id.* The seller in *Europlast* would not have divulged its confidential financial information if the buyer had not falsely represented its interest in acquiring the seller's business. Unlike *Europlast,* this Court does not find that Plaintiffs would have denied the "undercover" patients access to the Wisconsin and Indiana offices if Entine had not falsely represented that the *PrimeTime Live* segment would be a fair and objective report which did not use "ambush" journalism techniques.

*Count VI—Breach of Contract*

■■■ According to the Plaintiffs, Entine offered to make an agreement with Eye Services such that, if Eye Services cooperated with the preparation of the *PrimeTime Live* segment, the program would not focus exclusively on the Desnick Eye Center and would not use "undercover" surveillance techniques or "ambush" journalism. (Complaint at ¶ 71.) Dr. Desnick accepted Entine's offer and cooperated with Entine and his crew for the preparation of the *PrimeTime Live* segment by allowing the Defendants to videotape the interior of the Desnick Eye Center's Chicago Office, to interview doctors, to videotape live cataract surgery and to view Eye Center's informational videotape used for patient education. *Id.* at ¶ 72. Plaintiffs allege that the Defendants breached their agreement by focusing the show exclusively on Desnick Eye Center and by using "undercover" surveillance techniques and as a result of the breach, Eye Services has lost patients, profits and revenue. *Id.* at 74.

Defendants assert that this Court must dismiss Count VI because the Plaintiffs cannot show that their damages were caused by the Defendants' alleged breach. According to the Defendants, if the Plaintiffs' had never furnished any information to Entine in exchange for his promise not to focus the program on the Desnick Eye Center and not to use "undercover" surveillance techniques, the damages would have been the same. Yet, even assuming lost profits, patients and revenues were not a result of the breach, this Court cannot dismiss Count VI. As the Seventh Circuit noted in *Stromberger v. 3M Co.*,

990 F.2d 974, 976 (7th Cir.1993), the victim of a breach of contract is entitled to nominal damages, even if the plaintiff was not injured by the breach, because the breach itself is the wrong.

*Count VII—Defamation*

■■■ Finally, Defendants argue that two factors compel this Court to dismiss Plaintiffs' defamation claim. First, Defendants assert that the part of the program relating to the "rigging" of the auto-refractor which is the subject of Plaintiffs' Complaint says nothing about either Doctor Simon or Doctor Glazer. (Complaint at ¶ 38, 76–77.) [5] Thus, the Defendants conclude that Plaintiffs Simon and Glazer have not sufficiently pled that the alleged false and defamatory statements are "of and concerning" them.

■■■ In *Chapski v. Copley Press*, 92 Ill.2d 344, 65 Ill.Dec. 884, 442 N.E.2d 195, 198–99 (1982), the Illinois Supreme Court modified the innocent construction rule and held that,

> [A] written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff, it cannot be actionable *per se.*

Whether a statement is reasonably susceptible to an innocent construction is a question of law to be decided by the trial court. *Homerin v. Mid–Illinois Newspapers*, 245 Ill.App.3d 402, 185 Ill.Dec. 362, 364, 614 N.E.2d 496, 498 (3rd Dist.1993).

---

5. Paragraph 38 of the Complaint charges that the following portion of the broadcast was false and defamatory:

DONALDSON: [voice-over] This is the machine that measures glare. Its accuracy depends on its adjustment. Paddy Kalish is an optometrist who says when he worked at the Desnick clinic from 1987 to 1990, the machine was regularly rigged. He says he watched a technician tamper with the machine, this way. MR. KALISH: I'm putting the tape on the bulb and the tape covers the bulb. And then I'm going to use a marker to change the contrast on the bulb.

DONALDSON: [voice-over] Kalish then inserted the tampered bulb back in the machine, now ready for a customer. [interviewing] S–V–G–7—3–6–5. It's very difficult. [voice-over] This is what it now looked like on the machine's screen. MR. KALISH: Based on the test, you have a cataract on your left eye. DONALDSON: But because you tampered with the bulb. MR. KALISH: That is correct. DONALDSON: Now, is that what happened at Dr. Desnick's clinics? MR. KALISH: This happened routinely for all the older patients that came in for eye exams.

Plaintiffs argue that the innocent construction rule does not compel dismissal because, when the statements alleged in paragraph 38 of the Complaint are viewed in the context of the program, the statements cannot reasonably be interpreted as referring to individuals other than Dr. Simon and Dr. Glazer. Immediately prior to the segment regarding the "rigging" of the auto-refractor, the program depicts both Dr. Glazer and Dr. Simon discussing glare problems with "undercover" patients and Sam Donaldson reviewing a letter from Desnick Eye Center's chief surgeon which asserts that surgery was necessary in all of the test cases. (Transcript of *Prime-Time Live* at 7–8.)

The Court notes that Dr. Simon is only shown asking "undercover" patients whether they "ever notice any glare or bluriness when [they're] driving or difficulty with the signs?" *Id.* at 8. Thus, even when the program's depiction of Dr. Simon is viewed in context with the defamatory and false passage alleged in paragraph 38, the Court holds that accusation regarding the "rigging" of the auto-refractor can reasonably be interpreted as referring to individuals other than Dr. Simon.

In contrast to Dr. Simon, the program shows Dr. Glazer not only discussing glare with "undercover" patients but recommending cataract surgery even though an independent doctor suggested that surgery for at least one of these patients was unnecessary. Thus, this Court finds that the alleged defamatory and false statements regarding the "rigging" of the auto-refractor cannot reasonably be interpreted to refer to individuals other than Dr. Glazer.

In addition to the innocent construction rule, Defendants argue that the incremental harm doctrine compels dismissal of Plaintiffs defamation claim. In *Langston v. Eagle Publishing Co.*, 719 S.W.2d 612, 622 (Tex.Ct. App.1986), the court explained the incremental harm doctrine as follows:

The libel-proof doctrine has also developed along a second path, called the "incremental" approach, which requires the court to evaluate the defendant's communication in its entirety and to consider the effects of the challenged portion of the communica-

tion on the plaintiff's reputation in the context of the entire communication.... The incremental approach comes into play when the plaintiff only challenges a small or tangential part of an overwhelmingly negative communication.

*Id.* at 622. The Defendants argue that the Plaintiffs challenge a single portion of the program, that concerning the "rigging" of the auto-refractors, and if the challenged portion was eliminated, the program would be as damaging to the Plaintiffs' reputation. In addition to accusations regarding the "rigging" of the auto-refractor, the program noted that the physicians at Eye Services recommended cataract surgery even when (1) the surgery would not be appropriate under federal guidelines, (2) the surgery is unnecessary, and (3) the surgery would not be beneficial to the patient in light of other vision problems." (*PrimeTime Live* Transcript at 4–5, 7, 9.) The program also noted that Dr. Desnick regularly changes patients' records and that physicians at Eye Services diagnosed four of the five test patients, who were older than sixty-five and eligible for medicare, as needing cataract surgery even though an independent expert stated the surgery was unnecessary. *Id.* at 5, 6–7.

■ Plaintiffs argue that the doctrine of incremental harm has not been recognized by Illinois courts and thus should not be applied in the present case. This Court disagrees. First, this Court notes that, although the Supreme Court, in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, ——, 111 S.Ct. 2419, 2436, 115 L.Ed.2d 447 (1991) held that the incremental harm doctrine was not compelled by the First Amendment, it recognized that "state tort law doctrines of injury, causation, and damages calculation might allow a defendant to press the argument that the statements did not result in any incremental harm to the plaintiff's reputation."

In *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1224 (7th Cir.1993), plaintiff brought a libel suit against the author and publisher of a book. The plaintiff confined his libel claim to three statements in the book: (1) that the plaintiff left his children alone at night when he was supposed to be watching them, (2) that he lost jobs because of his drinking, and

(3) that he spent money on a car which he should have used to buy shoes for his children. *Id.* at 1226. Applying Illinois law, the Seventh granted judgement in favor of the Defendants because the book's depiction of the plaintiff was substantially true and because even without the contested statements, the book would have been equally damaging. *Id.* at 1228. The *Haynes* court stated,

> The rule of substantial truth is based on a recognition that falsehoods which do no *incremental* damage to the plaintiff's reputation do not injure the only interest that the law of defamation protects. A news report that contains a false statement is actionable "only when 'significantly greater opprobrium' results from the report containing the falsehood than would result from the report without the falsehood." *Herron v. King Broadcasting Co.,* [112 Wash.2d 762, 776 P.2d 98, 102–05 (1989).] ... Falsehoods that do not harm the plaintiff's reputation more than a full recital of the true facts about him would do are thus not actionable.

*Id.* (emphasis in original)

Accepting all of the Plaintiffs' allegations in their Complaint as true, this Court finds that the Plaintiffs only claim that one short passage of the program, that concerning the "rigging" of auto-refractors, was false and defamatory. *See,* Complaint at ¶ 38. Even if the Defendants had eliminated this passage, the program's depiction of Eye Services and its physicians would have been just as negative. Consequently, this Court concludes that as "significantly greater opprobrium" would not result from the actual program with the alleged false and defamatory statements than from a program without the challenged statements regarding the rigging of the auto-refractor, dismissal of the Plaintiffs' defamation claim is appropriate.

### CONCLUSION

For the foregoing reasons the Defendants' Motion to Dismiss is granted with regard to Counts I, II, III, IV, V and VII and denied with regard to Count VI.