In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2295

SCOTT DAHLSTROM, HUGH GALLAGLY,
PETER KELLY, ROBERT SHEA,
and EMMET WELCH,

*Plaintiffs-Appellees*,

*v.*

SUN-TIMES MEDIA, LLC,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-00658 — **Harry D. Leinenweber**, *Judge*.

ARGUED NOVEMBER 14, 2014 — DECIDED FEBRUARY 6, 2015

Before BAUER, FLAUM, and TINDER, *Circuit Judges*.

FLAUM, *Circuit Judge*. The Driver's Privacy Protection Act
("DPPA"), 18 U.S.C. § 2721 *et seq.*, prohibits individuals from
knowingly obtaining or disclosing "personal information"
from a motor vehicle record. In this interlocutory appeal,
five Chicago police officers brought suit against Sun-Times
Media, alleging that the publishing company violated the

DPPA by obtaining each officer's birth date, height, weight, hair color, and eye color from the Illinois Secretary of State's motor vehicle records, and publishing that information in a newspaper article that criticized a homicide investigation lineup in which the officers participated. Sun-Times moved to dismiss the officers' complaint, arguing that the published information does not constitute "personal information" within the meaning of the DPPA, or, in the alternative, that the statute's prohibition on acquiring and disclosing personal information from driving records violates the First Amendment's guarantees of free speech and freedom of the press.

As to the question of statutory interpretation, we conclude that the DPPA's definition of "personal information" extends to the details Sun-Times published here. With respect to the First Amendment challenge, we conclude that Sun-Times possesses no constitutional right either to obtain the officers' personal information from government records or to subsequently publish that unlawfully obtained information. We therefore affirm the district court's denial of Sun-Times's motion to dismiss.

## I. Background

Twenty-one-year-old David Koschman died after an April 25, 2004 altercation with R.J. Vanecko, a nephew of Richard M. Daley, then-Mayor of Chicago. Given Vanecko's political connections, the subsequent Chicago Police Department investigation was highly publicized. Several weeks after the incident, the Department placed Vanecko in an eyewitness lineup, in which five Chicago police officers participated as "fillers." These officers—plaintiffs Scott Dahlstrom, Hugh Gallagly, Peter Kelly, Robert Shea, and Emmet Welch ("the Officers")—closely resembled Vanecko in age,

height, build, and complexion. When eyewitnesses failed to positively identify Vanecko as the perpetrator, the Department declined to charge him. The Department closed the Koschman investigation in March 2011.[1]

Suspicious that the Department may have manipulated the homicide investigation because of Vanecko's high-profile Chicago connections, defendant Sun-Times Media published a series of investigative reports criticizing the Department's handling of the case. One such report, a November 21, 2011 article featured in the *Chicago Sun-Times* (and on the newspaper's website), questioned the legitimacy of the Vanecko lineup. The article, "Daley Nephew Biggest Guy on Scene, But Not in Lineup," highlights the physical resemblance between Vanecko and the lineup "fillers" in an effort to demonstrate that the Officers resembled Vanecko too closely for the lineup to be reliable. To support this accusation, Sun-Times published photographs of the lineup, as well as the names of each of the five officer "fillers." Sun-Times obtained these names and photographs from the Chicago Police Department pursuant to a request under the Illinois Freedom of Information Act ("FOIA"), 5 Ill. Comp. Stat. 140. However, the *Sun-Times* article featured not only the lineup

---

[1] Subsequently, the Circuit Court of Cook County appointed a special prosecutor to investigate the circumstances surrounding Koschman's death. *See In re Appointment of Special Prosecutor*, No. 2011 Misc. 46 (Cir. Ct. Cook Cnty. Apr. 23, 2012). In December 2012, Vanecko was indicted and charged with a single count of involuntary manslaughter. He pleaded guilty in January 2014.

photographs and the Officers' full names,[2] but also the
months and years of their birth, their heights, weights, hair
colors, and eye colors. Sun-Times credited the Chicago Po-
lice Department and the Illinois Secretary of State as sources.
The Officers contend—and Sun-Times has not disputed—
that Sun-Times knowingly obtained this additional identify-
ing information from motor vehicle records maintained by
the Secretary of State.

The Driver's Privacy Protection Act ("DPPA"), 18 U.S.C.
§ 2721 *et seq.*, enacted by Congress in 1994, states that, sub-
ject to certain limited exceptions not relevant here,[3] "[i]t shall

---

[2] On appeal, the Officers expressly allege that Sun-Times acquired only
their first and last names via the FOIA request, and obtained their mid-
dle initials and suffixes from state motor vehicle records. The district
court, however, determined that "[a]lthough the Complaint refers to
[Sun-Times] using Plaintiffs' 'names' to obtain their 'full names,' this
does not clearly allege that the names, as published, reflected data from
motor vehicle records instead of the FOIA request." The court therefore
determined that Sun-Times's publication of the Officers' full names
could not support a claim under the DPPA. Because the exclusion of
middle initials and suffixes from the range of information Sun-Times
allegedly acquired from the Officers' driving records does not substan-
tially affect our analysis, we do not reexamine the district court's deter-
mination.

[3] 18 U.S.C. § 2721(b) creates fourteen "permissible use" exceptions,
which set forth limited circumstances under which obtaining or disclos-
ing information from a motor vehicle record is permitted. The district
court, in its denial of Sun-Times's motion to dismiss, noted, "Defendant
does not contend that its publication of Plaintiffs' personal information
falls within any of these enumerated circumstances." On appeal, howev-
er, Sun-Times argues that its use of the Officers' information satisfies the
exception codified at § 2721(b)(14), which permits disclosure "[f]or any
… use specifically authorized under the law of the State that holds the

be unlawful for any person knowingly to obtain or disclose personal information[] from a motor vehicle record." 18 U.S.C. § 2722(a). A separate provision of the Act specifically proscribes officers, employees, and contractors of state departments of motor vehicles from knowingly disclosing that same information. § 2721(a). The DPPA defines "personal information" as

> information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status.

§ 2725(3). The DPPA provides a private right of action for any individual whose personal information has been obtained or disclosed in violation of the Act. § 2724(a).

---

record, if such use is related to the operation of a motor vehicle or public safety." Because the district court did not address this issue, and more importantly, because it poses a mixed question of law and fact unsuitable for interlocutory review, we decline to consider it here. *See Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 676–77 (7th Cir. 2000) (explaining that interlocutory review should be reserved for "pure" questions of law); *cf. Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 608 (7th Cir. 2012) (en banc) (concluding that whether a challenged disclosure was made for a permissible purpose under § 2721(b) could not be resolved at the motion-to-dismiss stage). We therefore proceed under the assumption that if the Officers' information constitutes "personal information" under the DPPA, Sun-Times has indeed committed a violation of the Act.

The Officers sued Sun-Times in the United States District Court for the Northern District of Illinois, claiming that by acquiring and publishing each Officer's approximate birth date, height, weight, hair color, and eye color, Sun-Times violated their rights under § 2722(a). They seek a declaratory judgment that Sun-Times violated the DPPA, an injunction requiring Sun-Times to permanently remove their information from its publications, actual and statutory damages, and punitive damages. The Officers do not challenge Sun-Times's publication of their photographs or names, as they concede that Sun-Times lawfully obtained that information pursuant to its FOIA request.

Sun-Times moved to dismiss the Officers' complaint for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). Sun-Times contends that the published information does not fall within the DPPA's definition of "personal information," or, alternatively, that if the DPPA bars Sun-Times from publishing this truthful information of public concern, the statute violates the First Amendment's guarantees of freedom of speech and freedom of the press. Sun-Times also argues that the Officers' requested injunction, if issued, would amount to an unconstitutional prior restraint on speech.

In September 2012, the district court determined that the challenged information does fall within the scope of "personal information" under the DPPA, and that Sun-Times's acquisition and publication of the Officers' information therefore violated the Act. Because this conclusion required the court to reach Sun-Times's First Amendment challenge to an act of Congress, the court temporarily continued the motion in order to permit the United States to intervene to

defend the constitutionality of the Act. After the government declined to participate, the district court ruled in November 2013 that the DPPA's prohibition on Sun-Times's obtainment and publication of the Officers' personal information does not violate the First Amendment. Although noting that the Officers had yet to demonstrate the necessity of an injunction against Sun-Times, the court also ruled that the requested injunction would not amount to an unconstitutional prior restraint.

Sun-Times then requested that the district court certify its orders for interlocutory appeal. Concluding that both the statutory interpretation issue and the constitutional challenge to the DPPA's prohibitions present "controlling question[s] of law as to which there is substantial ground for difference of opinion and that an immediate appeal … may materially advance the ultimate termination of the litigation," the district court granted Sun-Times's motion pursuant to 28 U.S.C. § 1292(b) in April 2014.[4] We granted Sun-Times's petition for interlocutory appeal, and further granted the United

---

[4] The district court did not certify the prior restraint question for interlocutory appeal, and we decline Sun-Times's invitation to address the issue. As the district court noted, the Officers' request for damages would stand even if an injunction were unavailable. Thus, the constitutionality of the hypothetical injunction does not present a "controlling" question of law and is ill-suited for interlocutory review. *See Homeland Stores, Inc. v. Resolution Trust Corp.*, 17 F.3d 1269, 1272 (10th Cir. 1994) ("[W]hether injunctive relief is available … is not … an alternate controlling question. … Because we hold … that [plaintiff]'s complaint does state a claim and, at minimum, relief would be available in the form of damages at law, we need not decide on the availability of any specific type of alternate relief here.").

States' motion to intervene to defend the constitutionality of the DPPA and to address the antecedent statutory question regarding the definition of "personal information" under the Act.

## II. Discussion

We review de novo questions of law presented on interlocutory appeal. *Triad Assocs., Inc. v. Robinson*, 10 F.3d 492, 495 (7th Cir. 1993).

### A. Definition of "Personal Information"

The DPPA proscribes knowingly obtaining or disclosing "personal information" from motor vehicle records. 18 U.S.C. § 2722(a). Sun-Times contends that the details it acquired from the Officers' driving records—i.e., each Officer's birth date, height, weight, hair color, and eye color—fall outside the statutory definition of "personal information" and that, therefore, Sun-Times's acquisition and publication of the Officers' information did not violate the Act. However, we conclude, based on the plain meaning of the DPPA's text, the underlying purpose of the Act, and language from prior decisions of this court and others, that the DPPA's definition of "personal information" encompasses the information at issue here.

"As in any case of statutory construction, our analysis begins with the language of the statute. … Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute." *Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 601 (7th Cir. 2012) (en banc) (citations and internal quotation marks omitted). The DPPA's definition of "personal information" expressly "*includ[es]* an individual's photograph, social security number, driver identification number, name, address (but not the

5-digit zip code), telephone number, and medical or disability information." 18 U.S.C. § 2725(3) (emphasis added). Sun-Times emphasizes that none of the information at issue here is explicitly included in this definition, and argues that any category not specifically listed must therefore lie beyond the Act's reach. In so arguing, Sun-Times advocates the application of the interpretive canon *expressio unius est exclusio alterius*, or "the expression of one thing suggests the exclusion of others." *Exelon Generation Co. v. Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO*, 676 F.3d 566, 571 (7th Cir. 2012). However, the Supreme Court has explained that the term "including"—which introduces the itemized list of characteristics that constitute "personal information" under the DPPA, *see* § 2725(3)—is typically "illustrative and not limitative." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994); *see also Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 189 (1941) ("To attribute such a [limitative] function to the participial phrase introduced by 'including' is to shrivel a versatile principle to an illustrative application. … The word 'including' does not lend itself to such destructive significance."). This court has also noted the disfavored status of the *expressio unius* doctrine. *See, e.g.*, *Exelon Generation Co.*, 676 F.3d at 571 (referring to "the much-derided maxim of *expressio unius est exclusio alterius*").

On its face, the DPPA's language appears broad: "'personal information' means information that identifies an individual," § 2725(3), and there is no indication that Congress intended the enumerated list of examples to be exhaustive. The Supreme Court, albeit in dicta, has also signaled that "personal information" may well include categories of information beyond those specifically identified in the statute: in *Reno v. Condon*, the Court noted that "[t]he DPPA defines

'personal information' as *any* information 'that identifies an individual.'" 528 U.S. 141, 144 (2000) (emphasis added). *Reno* dealt not with the issue of statutory interpretation, but rather with whether Congress's enactment of the DPPA violated either the Commerce Clause or the principles of federalism contained in the Tenth Amendment. *See id.* at 148–51. While it is possible that the Court unconsciously read the modifier "any" into the statutory text, it is equally plausible that the Court was subtly advocating an expansive reading of the term "personal information."

Each category of published information at issue here (age, height, weight, hair color, eye color) relates to the Officers' physical appearance and, therefore, indisputably aids in "identif[ying]" them. Yet Sun-Times insists that this information is merely descriptive and cannot be said to "identif[y] an individual" because it does not *uniquely* single out a particular person as does, for example, a Social Security number. However, the categories of "personal information" explicitly included in § 2725(3) directly undermine Sun-Times's theory. Although many of the itemized categories (e.g., driver identification number) do uniquely identify the individual with whom they are associated, others (e.g., medical and disability information) do not. In fact, even though medical and disability information do not uniquely pertain to a single individual, they are included in a subcategory of "highly restricted personal information," which receives even greater protection under the DPPA. *See* 18 U.S.C. § 2725(4). The express inclusion of these categories of information in § 2725(3) clearly demonstrates that Congress intended "personal information" to encompass a broader range of personal details than Sun-Times's proposed reading would allow.

The underlying purpose of the DPPA also supports reading "personal information" to extend to the personal details at issue here. The DPPA was enacted as a public safety measure, designed to prevent stalkers and criminals from utilizing motor vehicle records to acquire information about their victims. Prior to the law's enactment, anyone could contact the department of motor vehicles in most states and, simply by providing a license plate number and paying a nominal fee, obtain the corresponding driver's address and other pertinent biographical information—no questions asked. 140 Cong. Rec. H2526 (daily ed. Apr. 20, 1994) (statement of Rep. Porter Goss). At congressional hearings on the proposed legislation, numerous witnesses testified about the risks posed by unfettered public access to motor vehicle records.[5] The most highly publicized impetus for the Act's passage was the 1989 murder of television actress Rebecca Schaeffer by an obsessed fan who obtained her unlisted

---

[5] Law enforcement officers were among those to testify. Police sergeant Donald L. Cahill, who spoke on behalf of the Fraternal Order of Police, commented on the concerns of officers who were targeted for retribution:

> [N]umerous law enforcement officers over the years [have] had concerns about the ability of defendants, that they had helped prosecute; to surveil them at their place of employment and get their license plate number, and in turn trace that number through the state division of motor vehicles to get their home addresses. These officers feared for the safety of their families mostly as most of their time was spent away on the job.

*The Driver's Privacy Protection Act of 1993: Hearing on H.R. 3365 Before the Subcomm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary*, 103d Cong., 1994 WL 212833 (Feb. 3, 1994) (statement of Donald L. Cahill, Legislative Chairman, Fraternal Order of Police).

home address from the California Department of Motor Vehicles. *Maracich v. Spears*, 133 S. Ct. 2191, 2213 (2013) (Ginsburg, J., dissenting). The DPPA's legislative history reveals that "[t]he intent of [the Act] is simple—to protect the personal privacy and safety of all American licensed drivers." 140 Cong. Rec. H2526. Although a potential stalker would likely require information beyond hair and eye color to positively identify his victim, details regarding any pertinent physical feature would make such identification easier. Interpreting the DPPA's definition of "personal information" to include the identifying information at issue here would therefore advance the Act's important public safety goals.

A secondary purpose of the DPPA is similarly relevant to the challenged categories of information. The Supreme Court noted in *Maracich v. Spears* that Congress also enacted the DPPA to protect against "the States' common practice of selling personal information to businesses engaged in direct marketing and solicitation." 133 S. Ct. at 2198 (majority opinion). Much of the information at issue here, particularly details regarding an individual's age, height, and weight, could conceivably be of great interest to businesses (e.g., Weight Watchers) seeking to market their products or services to targeted audiences. While protection against commercial solicitation may not be as fundamental as the Act's public safety objectives, excluding these categories of information from the DPPA's definition of "personal information" would likely contravene legislative intent.

An expansive reading of "personal information" is further supported by the language of several cases, including a recent decision from our own court. Although the definition of "personal information" under 18 U.S.C. § 2725(3) was not

specifically at issue in these cases, they nevertheless provide helpful guidance as to the term's appropriate interpretation. In our 2012 en banc decision, *Senne v. Village of Palatine, Illinois*, where we dealt with the DPPA's "permissible use" exceptions, we noted that "[t]he otherwise protected information actually disclosed here included [plaintiff's] full name, address, driver's license number, *date of birth*, sex, *height, and weight*." 695 F.3d at 608 (emphases added). Other courts have also understood the DPPA's definition of "personal information" to encompass these personal characteristics. *See, e.g., Johnson v. W. Publ'g Corp.*, 801 F. Supp. 2d 862, 877 (W.D. Mo. 2011) (noting that "[a] potential stalker cannot walk into a Missouri DMV to obtain every Missouri driver's name, address, *height, weight, eye color*, driver's license number, and social security number without a specific permissible use under the DPPA" (emphasis added)), *rev'd on other grounds*, 504 F. App'x 531 (8th Cir. 2013); *Manso v. Santamarina & Assocs.*, No. 04 Civ. 10276, 2005 WL 975854, at *2–3 (S.D.N.Y. Apr. 26, 2005) (explaining that plaintiff's "name, address, *date of birth, height,* gender, *eye color*, New York State Motor Vehicle Identification Number, restrictive lens status, license class, license status and license expiration date" "does qualify as 'personal information' under the DPPA" (emphases added)). Although these decisions are not dispositive, they indicate that the great weight of the case law supports interpreting the statute's coverage to extend to the information at issue here.[6]

---

[6] The lone authority that Sun-Times invokes in support of its position is *Camara v. Metro-North Railroad Co.*, 596 F. Supp. 2d 517, a 2009 opinion from the United States District Court for the District of Connecticut. The

Based on the foregoing analysis, we conclude that each Officer's approximate date of birth, height, weight, hair color, and eye color fall within the range of "personal information" to which the DPPA's protections apply. Sun-Times therefore violated the Act when it knowingly obtained the Officers' personal details from the Illinois Secretary of State and proceeded to publish them.

Sun-Times objects that this reading of "personal information" renders the DPPA void for vagueness because it incorporates categories of information not explicitly enumerated in the statute, which will allegedly force "men of common intelligence … to guess at the meaning of the criminal law."[7] *Smith v. Goguen*, 415 U.S. 566, 574 (1974) (citation and

---

*Camara* court, "[a]pplying the interpretive doctrine of *expressio unius est exclusio alterius*," concluded in a footnote that an individual's birth date does not fall within the DPPA's definition of "personal information." *Id.* at 523 n.9. As we explain above, we do not believe that the doctrine of *expressio unius* is applicable here, and *Camara* offers no persuasive reason—indeed, no reason at all—to prompt us to reconsider our position.

[7] Sun-Times protests that the Officers "cannot explain how the Secretary of State's office, let alone lay reporters, could intuit that the contours of the DPPA definition for 'personal information' were broader than expressly stated." But at least one prominent organization dedicated solely to providing free legal assistance to reporters has interpreted "personal information" to include the published information at issue here. The Reporters Committee for the Freedom of the Press ("RCFP"), a nonprofit organization that has provided legal advice, resources, and advocacy to journalists for more than forty years—*see About Us*, Reporters Committee for the Freedom of the Press, www.rcfp.org/about—issued a 2010 guide, which explains the rights of journalists under various federal privacy protection laws, including the DPPA. That guide describes the DPPA's scope as follows:

internal quotation marks omitted). However, the reading of § 2725(3) that we adopt today does not strain the DPPA's plain meaning, directly advances its underlying legislative goals, and has been implicitly adopted by several courts. Information including age, hair color, eye color, weight, and height falls squarely within the universe of information that "identifies" an individual and, therefore, our interpretation is "clear and precise enough to give a person of ordinary intelligence fair notice about what is required of him." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 835 (7th Cir. 2014).

### B. First Amendment Analysis

Having established that the information in question is "personal information" within the meaning of the DPPA, we turn to Sun-Times's challenge to the constitutionality of the statute itself, as applied to the facts of this case. Sun-Times contends that, in preventing the media from obtaining

---

> The protected privacy information *includes all of the information attached to a person's driver's license record and application*, such as their name, address, telephone number, vehicle description, Social Security Number, driver identification number, photograph, *height, weight*, gender, *age*, driving-related medical conditions and fingerprints. The law does not, however, protect a driver's traffic violations, accidents or current license status from release.

Reporters Comm. for the Freedom of the Press, *FERPA, HIPAA & DPPA: How Federal Privacy Laws Affect Newsgathering* 4 (Spring 2010), *available at* http://www.rcfp.org/rcfp/orders/docs/FHD.pdf (emphases added). This language indicates that one of the primary legal resources for "lay reporters" has long interpreted the DPPA's definition of "personal information" as we do today.

information from an individual's motor vehicle record and publishing that information, the DPPA violates the First Amendment's guarantees of free speech and freedom of the press. Because the DPPA proscribes both obtaining personal information from driving records and subsequently disclosing that information, we address the constitutionality of each prohibition in turn.

1. *The DPPA's Prohibition on Obtaining Personal Information*

Sun-Times first argues that the DPPA's prohibition on obtaining personal information from motor vehicle records interferes with the ability of the press to gather the news. As an initial matter, it is important to note that the First Amendment provides no special solicitude for members of the press. Although the Supreme Court has commented that "news gathering is not without its First Amendment protections," *Branzburg v. Hayes*, 408 U.S. 665, 707 (1972), it has repeatedly declined to confer on the media an expansive right to gather information, concluding that such an approach would "present practical and conceptual difficulties of a high order." *Id.* at 703–04. Rather, the Court has held that the First Amendment "does not guarantee the press a constitutional right of special access to information not available to the public generally," *Pell v. Procunier*, 417 U.S. 817, 833 (1974) (quoting *Branzburg*, 408 U.S. at 684), and has further stated that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991).

We conclude that Sun-Times has not alleged a cognizable First Amendment injury with respect to the DPPA's prohibition on obtaining information from driving records—a

limitation only on *access* to information. In *Travis v. Reno*, we rejected a facial challenge to the DPPA and noted that "[p]eering into public records is not part of the 'freedom of speech' that the first amendment protects. 'There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy.'" 163 F.3d 1000, 1007 (7th Cir. 1998) (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 14 (1978) (plurality opinion)). This position accords with the Supreme Court's holding that "there is no constitutional right to obtain all the information provided by FOIA laws." *McBurney v. Young*, 133 S. Ct. 1709, 1718 (2013); *see also L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 34, 40 (1999) (noting, in analyzing a state statute that placed conditions on public access to arrestees' addresses, "California could decide not to give out arrestee information at all without violating the First Amendment"). Numerous federal statutes, including, for instance, the Privacy Act of 1974, 5 U.S.C. § 552a, limit public access to sensitive information,[8] and the constitutionality of those limitations is widely accepted. *See Travis*, 163 F.3d at 1007 ("No one thinks that the Privacy Act violates the first amendment. Well, maybe these plaintiffs *do* think this, but the position is untenable.").

---

[8] 5 U.S.C. § 552a(b) mandates, "No [federal] agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," subject to limited exceptions not relevant here. Although the Privacy Act restricts the ability of federal agencies to disclose information rather than the ability of individuals to collect information, the effect on the press's ability to gather the news is the same.

It is true that the Supreme Court has recognized a limited right of access to certain governmental proceedings, specifically those related to the judicial process. *See, e.g.*, *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 605–06 (1982) (recognizing a constitutional—though not absolute—right of public access to criminal trials); *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 10 (1986) (extending to preliminary hearings the qualified First Amendment right of access to criminal trials acknowledged in *Globe*). Yet in *Globe Newspaper Co. v. Superior Court*, which held that a statute excluding the public from criminal trials during the testimony of minor sexual assault victims failed to withstand strict scrutiny, the Court emphasized that the right of access to criminal trials is rooted in the access that the public and press historically enjoyed to such proceedings, which led to a presumption of openness. 457 U.S. at 605. The Court further explained that "public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government." *Id.* at 606. There is no corresponding need for public participation in the maintenance of driving records, which can hardly be described as an "essential component" of self-government.

Sun-Times argues that, although on its face the DPPA is aimed at limiting *access* to motor vehicle records at the outset, the statute was nevertheless enacted to suppress speech—albeit at an earlier point in the speech process. *See Citizens United v. FEC*, 558 U.S. 310, 336 (2010) ("Laws enacted to control or suppress speech may operate at different points in the speech process."). The DPPA, according to Sun-Times, restricts speech because it restricts the news media's ability to gather and report the news. Sun-Times looks

primarily to our opinion in *American Civil Liberties Union of Illinois v. Alvarez* ("*ACLU*"), 679 F.3d 583 (7th Cir. 2012), to support its contention. In *ACLU*, we held that an Illinois statute prohibiting individuals from making audio recordings of police officers performing their duties in public triggered heightened First Amendment scrutiny and likely violated the First Amendment under either intermediate or strict scrutiny. *Id.* at 586–87. We emphasized that although the statute prohibited the *making* of the recording rather than the core free speech right to *disseminate* the resulting recording, the statute nevertheless burdened speech. *Id.* at 595. We concluded that "[t]he right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected." *Id.* Sun-Times contends that our reasoning in *ACLU* indicates that although the DPPA does not prevent Sun-Times from publishing personal information obtained through lawful means, the Act's ban on the acquisition of personal information from an individual's motor vehicle record amounts to an unconstitutional burden on speech.

However, *ACLU* is distinguishable on several grounds. While the Illinois eavesdropping statute's effect on First Amendment interests was "far from incidental" because it banned "*all* audio recording of *any* oral communication," *id.* at 595, 602, the same is not true of the DPPA's prohibition on the acquisition of personal information from a single, isolated source. It can hardly be said that this targeted restriction renders Sun-Times's right to publish the truthful information at issue here—much of which can be gathered from physical observation of the Officers or from other lawful sources (including, of course, a state FOIA request)— "largely ineffective." Further, in forbidding only the act of

peering into an individual's personal government records, the DPPA protects privacy concerns not present in *ACLU*. If a member of the press observed one of the Officers in public—for example, during a traffic stop—he could publish any information gleaned from that interaction without offending the DPPA. By contrast, the Illinois eavesdropping statute operated as a total ban on recording police officers' activities, even when they were "performing their duties in public places and speaking at a volume audible to bystanders." *Id.* at 605.

The nature of the restricted form of expression also figured prominently in our *ACLU* analysis. We noted that "[a]udio and audiovisual recording are media of expression commonly used for the preservation and dissemination of information and ideas and thus are included within the free speech and free press guaranty of the First and Fourteenth Amendments." *Id.* at 595 (citation and internal quotation marks omitted). We also identified photography, note-taking, and the posting of signs as other common media of expression. *Id.* at 595–96. Yet while the eavesdropping statute "restrict[ed] the use of a *common, indeed ubiquitous, instrument of communication*," *id.* at 596 (emphasis added), the act of harvesting information from driving records is hardly such an instrument. We are therefore unpersuaded by Sun-Times's attempt to analogize a total ban on recording police officers' actions in public to the DPPA's effort to maintain the privacy of personal information contained in an individual's driving record.

For the foregoing reasons, we conclude that the DPPA's prohibition on knowingly obtaining an individual's personal information from motor vehicle records does not trigger

heightened First Amendment scrutiny and instead requires only rational basis review. *See Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 652–53, 657 n.12 (7th Cir. 2013) (explaining that a regulation that does not prompt First Amendment scrutiny is properly subjected to rational basis review, "the residual level of scrutiny that courts apply to all laws not involving a suspect class or infringing a fundamental right"). Because limiting public access to driving records is rationally related to the government's legitimate interest in preventing "stalkers and criminals [from] acquir[ing] personal information from state DMVs," the restriction easily satisfies the deferential rational basis standard. *Maracich*, 133 S. Ct. at 2198; *see also Wis. Educ. Ass'n Council*, 705 F.3d at 653 (setting forth the rational basis test).

### 2. *The DPPA's Prohibition on Disclosing Personal Information*

Because the DPPA restricts the collection of personal information from driving records irrespective of whether that information is subsequently disclosed, and because we have determined that this restriction does not violate the First Amendment, Sun-Times's acquisition of the Officers' personal information is sufficient to establish an actionable violation of the statute. *See* 18 U.S.C. § 2724 (providing a private right of action and a damages award not less than $2,500 in liquidated damages against anyone who "knowingly obtains … personal information[] from a motor vehicle record"). Yet, because Sun-Times has also been accused of violating the DPPA by publishing the Officers' personal information, we must independently consider whether the Act's prohibition on such publication violates the First Amendment.

Although we have established that the DPPA's limitation on *obtaining* personal information is not a restriction on

speech at all, the Act's prohibition on *disclosing* that information is a direct regulation of speech. As the Supreme Court has noted, "If the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category … ." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (citation and internal quotation marks omitted). The appropriate standard of review for such a regulation hinges on whether the regulation is content based, which requires us to apply strict scrutiny, or content neutral, which demands only an intermediate level of scrutiny "because in most cases the[se regulations] pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 642 (1994).

The DPPA proscribes only the publication of personal information that has been obtained from motor vehicle records. The origin of the information is thus crucial to the illegality of its publication—the statute is agnostic to the dissemination of the very same information acquired from a lawful source. The Supreme Court has concluded that disclosures that are prohibited "by virtue of the source, rather than the subject matter" are easily categorized as content neutral. *Bartnicki*, 532 U.S. at 526 (designating as content neutral a federal statute forbidding disclosure of the contents of unlawfully intercepted wire, electronic, or oral communications). The DPPA, of course, presents a hybrid situation—in which the illegality of a disclosure is determined by a combination of source (motor vehicle records) and subject matter (personally identifiable information)—which therefore does not conclusively answer the content neutrality inquiry. However, because the Act permits publication of identical information so long as that information flows from

a source other than driving records, it "implicates the First Amendment rights of the restricted party to a far lesser extent than would restraints on dissemination of information in a different context." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984) (concluding that a protective order allowing a party to "disseminate the identical information covered by the … order as long as the information [wa]s gained through means independent of the court's processes" did not offend the First Amendment).

"[T]he principal inquiry in determining content neutrality … is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *ACLU*, 679 F.3d at 603 (alterations in original) (quoting *Turner Broad. Sys.*, 512 U.S. at 642). Congress crafted the DPPA's limitation on disclosure of personal information not because it disagreed with the message communicated by drivers' personal details, but in order to keep individuals' identifying information out of the hands of potential stalkers. And, although the DPPA exempts select uses from its ban on disclosure, *see* 18 U.S.C. § 2721(b), these exceptions are not premised on a preference for one category of speech over another; rather, they permit disclosure under those limited circumstances in which Congress deemed the public safety risk to be minimal.[9] Therefore, while the

---

[9] The "permissible uses" listed in § 2721(b) generally relate to operation of motor vehicles (§ 2721(b)(2), (7), (9), (10), (14)); insurance coverage (§ 2721(b)(6)); and use by government or security entities, or in legal proceedings (§ 2721(b)(1), (4), (8)). All other permissible uses require the express consent of the individual whose personal information is at issue (§ 2721(b)(11)–(13)), or contain safeguards to prevent intrusions on privacy. *See* § 2721(b)(3) (permitting verification only of personal information

DPPA's "permissible use" exceptions may have "an incidental effect on some speakers or messages but not others," we nonetheless conclude that the DPPA is content neutral because its public safety goals are "unrelated to the content of [the regulated] expression." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

The Supreme Court has established that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979); *see also Fla. Star v. B.J.F.*, 491 U.S. 524, 533 (1989). Sun-Times, however, cites no authority for the proposition that an entity that acquires information by breaking the law enjoys a First Amendment right to disseminate that information. Instead, all of the many cases on which Sun-Times relies involve scenarios where the press's initial acquisition of sensitive information was lawful.

In *Smith v. Daily Mail Publishing Co.*, staff of a local newspaper released the name of a suspected juvenile shooter after learning his identity from witness interviews at the scene of the homicide. 443 U.S. at 99. This disclosure violated a West Virginia statute prohibiting the press from publishing, without court approval, the name of any youth charged as a juvenile offender. *Id.* at 98. Crucial to the Supreme Court's holding that the statute violated the First Amendment was the fact that the press had lawfully obtained the suspect's

---

submitted by the individual himself); § 2721(b)(5) (allowing use of personal information in research activities but prohibiting publication).

name. *See id.* at 105 ("Our holding in this case is narrow. There is no issue before us of unlawful press access to confidential judicial proceedings … ."). The Court faced a similar scenario in *Florida Star v. B.J.F.*: a newspaper's publication—in violation of a Florida statute—of a rape victim's name, which the paper obtained from a public police report. 491 U.S. at 526. Once again, the lawfulness of the press's acquisition of the victim's name proved material to the Court's invalidation of the statute on First Amendment grounds. *See id.* at 536 ("[A]ssuming the Constitution permitted a State to proscribe *receipt* of information, Florida has not taken this step."). Even in *Bartnicki v. Vopper*—where a divided Supreme Court held that the First Amendment protected the publication of an *illegally* intercepted cellular telephone conversation—the unlawful interception and recording were perpetrated by an unknown third party who then transmitted the recording to the media. *See* 532 U.S. at 535 (concluding that "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern").[10] Although in *Bartnicki* the press had reason to know that the initial interception was unlawful,

---

[10] In *Bartnicki*, an unidentified individual illegally intercepted and recorded a telephone call between the president of a local teachers' union and the union's chief negotiator, which addressed the status of collective bargaining negotiations between the union and the school board. At one point in the conversation, the president commented that if the school board would not accommodate a raise of at least three percent, "we're gonna have to go to their, their homes … . To blow off their front porches, we'll have to do some work on some of those guys." 532 U.S. at 518–19.

the press's "access to the information … was obtained lawfully." *Id.* at 517–18, 525.

Sun-Times fares no better in its invocation of precedent from this circuit. Sun-Times points to our opinion in *Thomas v. Pearl*, 998 F.2d 447, 449 (7th Cir. 1993), in which a college basketball coach secretly taped conversations with a player about illegal perks offered by a rival university, as an example of what Sun-Times terms "theoretically unlawful news-gathering techniques inherent to successful journalism." Yet in *Thomas*, we determined that the coach lacked the requisite intent to be found in violation of federal wiretapping laws, *id.* at 452–53, and thus had not unlawfully obtained the information at issue. Sun-Times also cites *Desnick v. American Broadcasting Cos.*, 44 F.3d 1345, 1355 (7th Cir. 1995), for the proposition that the First Amendment protects a broadcaster's "surreptitious, confrontational, unscrupulous and ungentlemanly" investigatory tactics. But *Desnick*'s ruling applies only insofar as "no established rights are invaded in the process." *Id.* Here, of course, Sun-Times's acquisition of the Officers' personal information invaded their established rights under the DPPA. This is a crucial distinction. Although Sun-Times claims that, in acquiring and disclosing truthful information, it engaged only in "perfectly routine, traditional journalism," it cannot escape the fact that it acquired that truthful information *unlawfully.*

Given this distinction, we enter uncharted territory in our analysis of what the Supreme Court has identified as a "still-open question"—that is, "whether, in cases where information has been acquired *unlawfully* by a newspaper[,] … government may ever punish not only the unlawful acquisition, but the ensuing publication as well." *Bartnicki*, 532 U.S.

at 528 (citation and internal quotation marks omitted). As a content-neutral regulation, § 2722(a)'s limitation on disclosure will withstand First Amendment scrutiny if it "furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner Broad. Sys.*, 512 U.S. at 662 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).

The DPPA's prohibition on disclosing individuals' personally identifiable information—separate and apart from its ban on obtaining that information—advances two government interests, both of which relate to the Act's underlying public safety goals: first, the interest in removing an incentive for parties to unlawfully obtain personal information in the first instance; and second, the interest in minimizing the harm to individuals whose personal information has been illegally obtained. Analyzing similar asserted interests with respect to a federal ban on the disclosure of illegally intercepted cellular telephone conversations, the *Bartnicki* Court "assume[d] that those interests adequately justify the [statute's] prohibition … against the interceptor's own use of information that he or she acquired by violating [the statute]." 532 U.S. at 529.

In evaluating the proffered interest in deterrence, however, the *Bartnicki* Court was unwilling to accept the government's contention that a ban on disclosure by individuals who lawfully came into possession of intercepted communications would meaningfully discourage the initial unlawful interception by a third party. *See id.* ("The normal method of

deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."). The Court found "no basis for assuming that imposing sanctions upon [publishers of information] will deter the [unlawful interceptor of that information] from continuing to engage in surreptitious interceptions." *Id.* at 531. We would face an analogous scenario if a third party had obtained personal information in violation of the DPPA and transmitted that information to Sun-Times, who subsequently published it. But that is not our case. Here, there is no intervening illegal actor: Sun-Times itself unlawfully sought and acquired the Officers' personal information from the Secretary of State, and proceeded to publish it. Where the acquirer and publisher are one and the same, a prohibition on the publication of sensitive information operates as an effective deterrent against the initial unlawful acquisition of that same information. Such acquisition carries little benefit independent of the right to disseminate that information to a broader audience**.** We therefore conclude that the government's deterrence interest is both important and likely to be advanced by the DPPA's ban on Sun-Times's disclosure of the Officers' personal information.

The Supreme Court has also recognized the importance of the government's second asserted interest—protecting the privacy of individuals whose personal information has been illegally obtained. The *Bartnicki* Court

> acknowledge[d] that some intrusions on privacy are more offensive than others, and that the disclosure of the contents of … private [information] can be an even greater intrusion on privacy than the interception itself. As a result,

> there is a valid independent justification for
> prohibiting such disclosures by persons who
> lawfully obtained access to the contents of an
> illegally intercepted message, even if that pro-
> hibition does not play a significant role in pre-
> venting such interceptions from occurring in
> the first place.

*Id.* at 533. Where, as here, a prohibition on disclosure *does* play a significant role in deterring the initial unlawful inter-ception of sensitive information—and also where the party facing disclosure restrictions did not lawfully obtain the in-formation at issue—the argument in support of prohibition becomes even stronger. Yet while the *Bartnicki* Court recog-nized the substantial state interest in privacy protection, it nevertheless determined that, under the applicable facts, "privacy concerns give way when balanced against the in-terest in publishing matters of public importance." *Id.* at 534.

We conclude, however, that the balance in the instant case tips in the opposite direction. Although the *Sun-Times* article relates to a matter of public significance—the allega-tion that the Chicago Police Department manipulated a homicide investigation—the specific details at issue are largely cumulative of lawfully obtained information pub-lished in that very same article, and are therefore of less pressing public concern than the threats of physical violence in *Bartnicki*. *See id.* at 536 (Breyer, J., concurring) (noting that the intercepted conversation presented a "matter of unusual public concern"). While Sun-Times provided details of the Officers' physical traits to highlight the resemblance be-tween the "fillers" and Vanecko, most of the article's editori-al force was achieved through publication of the lineup

photographs that Sun-Times obtained through its FOIA request—the value added by the inclusion of the Officers' personal information was negligible. Each Officer's height is evident from the lineup photographs, while their weights and ages are relevant only to the extent that they increase the Officers' resemblance to Vanecko—a resemblance that the photographs independently convey. And, although identifying the Officers' hair and eye colors may add some detail to the published black-and-white photographs, their personal information is largely redundant of what the public could easily observe from the photographs themselves. Therefore, Sun-Times's publication of the Officers' personal details both intruded on their privacy and threatened their safety, while doing little to advance Sun-Times's reporting on a story of public concern. Certainly, in context, the significance of the Officers' personal information does not rise to the level of the threats of physical violence at issue in *Bartnicki*,[11] and

---

[11] Justice Breyer, joined by Justice O'Connor, concurred in the *Bartnicki* Court's 6–3 decision in favor of publication, but emphasized that he did so based on the unique circumstances of the case—that is, where "the speakers' legitimate privacy expectations are unusually low, and the public interest in defeating those expectations is unusually high." 532 U.S. at 540 (Breyer, J., concurring). Justice Breyer stressed that "in finding a constitutional privilege to publish unlawfully intercepted conversations of the kind here at issue, the Court does not create a 'public interest' exception that swallows up the [federal wiretapping] statutes' privacy-protecting general rule. Rather, it finds constitutional protection for publication of intercepted information of a special kind." *Id.* He noted that although he agreed with the Court's holding, he "would not extend that holding beyond these present circumstances." *Id.* at 541. Because the Officers' privacy expectations in their personal information are significantly greater—and the public value of that information is significantly lesser—than in *Bartnicki*, a ruling in Sun-Times's favor would represent a

therefore does not override the government's substantial interest in privacy protection. In sum, we conclude with respect to the first prong of the intermediate scrutiny analysis, that the government's asserted interests are both important and furthered by the DPPA's prohibition on disclosure.

As for the second prong of the analysis, both of the government's interests—(1) deterring the initial illegal acquisition of personal information, and (2) protecting the privacy of individuals whose information has been illegally obtained—are unrelated to the suppression of free expression and instead relate to the promotion of public safety. Finally, we inquire whether § 2722(a) is narrowly tailored such that it encroaches upon First Amendment freedoms only to the extent necessary to further those government interests. *Turner Broad. Sys.*, 512 U.S. at 662. The Supreme Court has provided helpful guidance with respect to the application of this third and final prong of the intermediate scrutiny analysis:

> To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests. "Rather, the requirement of narrow tailoring is satisfied so long as the … regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Narrow tailoring in this context requires, in other words, that the means chosen do not

---

substantial extension of *Bartnicki*'s "narrow holding," *id.* at 536—separate and apart from the other distinguishing features of the instant case.

> "burden substantially more speech than is necessary to further the government's legitimate interests."

*Id.* (alteration in original) (quoting *Ward*, 491 U.S. at 799) (some internal quotation marks omitted).

The DPPA's disclosure prohibition contains several safeguards characteristic of narrow tailoring: it is content neutral, it permits publication of the same information gathered from lawful sources, it imposes no special burden upon the media, and it has a scienter requirement ("knowingly") to provide fair warning to potential offenders. *See Bartnicki*, 532 U.S. at 548 (Rehnquist, C.J., dissenting) (cataloguing the distinguishing features of narrowly tailored regulations). The prohibition also contains fourteen "permissible use" exceptions, which permit disclosure under those circumstances deemed unlikely to threaten an individual's personal safety. *See* 18 U.S.C. § 2721(b); *see also supra* note 9. Given these features, we conclude that § 2722(a) does not burden substantially more speech than necessary to further the government's legitimate interests, *Ward*, 491 U.S. at 799, and therefore withstands intermediate scrutiny.

For these reasons, we conclude that the DPPA's prohibition on disclosing the Officers' personal information does not violate Sun-Times's First Amendment rights. As this is an as-applied challenge, our holding is limited to the facts and circumstances of this case. We do not opine as to whether, given a scenario involving lesser privacy concerns or information of greater public significance, the delicate balance might tip in favor of disclosure. We hold only that, where members of the press unlawfully obtain sensitive information

that, in context, is of marginal public value, the First Amendment does not guarantee them the right to publish that information. The district court therefore did not err in denying Sun-Times's motion to dismiss the Officers' claim that Sun-Times violated their rights under the DPPA.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Sun-Times's motion to dismiss and REMAND for further proceedings consistent with this opinion.